# ALAMO LAND & CATTLE CO., INC. *v.* ARIZONA

No. 74–125.   Argued October 14–15, 1975—
Decided February 24, 1976

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 311. STEVENS, J., took no part in the consideration or decision of the case.

*J. Gordon Cook* argued the cause and filed briefs for petitioner.

*Peter C. Gulatto,* Assistant Attorney General of Arizona, argued the cause for respondent. With him on the brief was *Bruce E. Babbitt,* Attorney General.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents an issue of federal condemnation law—as it relates to an outstanding lease of trust lands—that, we are told, affects substantial acreage in our Southwestern and Western States.

I

Under § 24 [1] of the New Mexico-Arizona Enabling Act, 36 Stat. 572 (1910), specified sections of every township in the then proposed State were granted to Arizona "for the support of common schools." By § 28 [2]

---

[1] "Sec. 24. That in addition to sections sixteen and thirty-six, heretofore reserved for the Territory of Arizona, sections two and thirty-two in every township in said proposed State not otherwise appropriated at the date of the passage of this Act are hereby granted to the said State for the support of common schools . . . ."

[2] "Sec. 28. That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed

of the same Act, 36 Stat. 574, as amended by the Act of June 5, 1936, c. 517, 49 Stat. 1477, and by the Act of June 2, 1951, 65 Stat. 51, the lands transferred "shall

to the said State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

"Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, shall be deemed a breach of trust.

"No mortgage or other encumbrance of the said lands, or any part thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever. . . . Nothing herein contained shall prevent: (1) the leasing of any of the lands referred to in this section, in such manner as the Legislature of the State of Arizona may prescribe, for grazing, agricultural, commercial, and homesite purposes, for a term of ten years or less; . . . or (4) the Legislature of the State of Arizona from providing by proper laws for the protection of lessees of said lands, whereby such lessees shall be protected in their rights to their improvements (including water rights) in such manner that in case of lease or sale of said lands to other parties the former lessee shall be paid by the succeeding lessee or purchaser the value of such improvements and rights placed thereon by such lessee.

"All lands, leaseholds, timber, and other products of land, before being offered, shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained . . . .

"No lands shall be sold for less than their appraised value . . . .

.          .          .          .          .

"A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any moneys shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular

be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified . . . and . . . the . . . proceeds of any of said lands shall be subject to the same trusts as the lands producing the same." Arizona, by its Constitution, Art. 10, § 1,[3] accepted the lands so granted and its trusteeship over them.

Among the lands constituting the grant to Arizona were two parcels herein referred to as Tract 304 and Tract 305, respectively.[4] On February 8, 1962, Arizona, as lessor, and petitioner Alamo Land and Cattle Company, Inc. (Alamo), as lessee, executed a grazing lease of

---

land producing such moneys was by this Act conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. . . .

"Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this Act shall be null and void, any provision of the constitution or laws of the said State to the contrary notwithstanding."

[3] "All lands expressly transferred and confirmed to the State by the provisions of the Enabling Act approved June 20, 1910, including all lands granted to the State and all lands heretofore granted to the Territory of Arizona, and all lands otherwise acquired by the State, shall be by the State accepted and held in trust to be disposed of in whole or in part, only in manner as in the said Enabling Act and in this Constitution provided, and for the several objects specified in the respective granting and confirmatory provisions. The natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same."

[4] Tract 304:

"All of Section 2, Township 10 North, Range 13 West, Gila and Salt River Base and Meridian, Yuma County, Arizona."

Tract 305:

"All of Section 36, Township 11 North, Range 13 West, Gila and Salt River Base and Meridian, Yuma County, Arizona." App. 1–2.

these tracts for the 10-year period ending February 7, 1972. App. 6–14. By Arizona statute, Ariz. Rev. Stat. Ann. 37–281D (1974), incorporated by general reference into the lease, App. 7, Alamo may not use the lands for any purpose other than grazing.

On May 31, 1966, while the two tracts were subject to the grazing lease and were utilized as part of Alamo's larger operating cattle ranch, the United States filed a complaint in condemnation in the United States District Court for the District of Arizona in connection with the establishment of a flood control dam and reservoir at a site on the Bill Williams River. The tracts in their entirety were among the properties that were the subject of the complaint in condemnation. The District Court duly entered the customary order for delivery of possession.[5]

Thereafter, the United States and Arizona and, separately, the United States and Alamo, stipulated that "the full just compensation" payable by the United States "for the taking of said property, together with all improvements thereon and appurtenances thereunto belonging" was $48,220 for Tract 304 and $70,400 for Tract 305, and thus a total of $118,620 for the two. 1 Record 156, 162.[6]

At a distribution hearing held to determine the proper allocation of the compensation amounts, the only parties claiming an interest in the awards for the two tracts were respondent Arizona, asserting title through the federal grants to it, and petitioner Alamo, asserting a compensable leasehold interest in the lands and a compensable

---

[5] No question is raised as to the propriety or effectiveness of the condemnation procedure.

[6] These figures were also the compensation estimated for the respective tracts in the declaration of taking and paid into court. 1 Record 15.

interest in the improvements thereon. The State conceded that Alamo was entitled to receive the value of the improvements, but contested Alamo's right, as lessee, to participate in the portion of the award allocated to land value. The District Court, with an unreported opinion, App. 1–5, awarded Arizona $57,970 for its fee interest, and awarded Alamo $3,600 for the improvements and $57,050 for "its leasehold interest at the time of taking, and its reasonable prospective leasehold interest." 1 Record 227–228. On appeal, the United States Court of Appeals for the Ninth Circuit, while recognizing that Alamo was entitled to compensation for the improvements, held that under the Enabling Act Arizona "had no power to grant a compensable property right to Alamo," and that "Alamo therefore never acquired a property right for which it is entitled to compensation." *United States* v. *2,562.92 Acres of Land,* 495 F. 2d 12, 14 (1974). The Court of Appeals thus reversed the judgment of the District Court insofar as it concerned the leasehold interests. It remanded the cause for the entry of a new judgment in accordance with its opinion. *Id.,* at 15. Because the Ninth Circuit's decision appeared to implicate this Court's decision in *Lassen* v. *Arizona ex rel. Arizona Highway Dept.,* 385 U. S. 458 (1967), and because it was claimed to be in conflict with *Nebraska* v. *United States,* 164 F. 2d 866 (CA8 1947), cert. denied, 334 U. S. 815 (1948), we granted Alamo's petition for certiorari. 420 U. S. 971 (1975).

## II

The *Lassen* case was an action instituted by the Arizona Highway Department to prohibit the application by the State Land Commissioner of rules governing the acquisition of rights-of-way and material sites in federally donated lands held by Arizona in trust pursuant to the provisions of the Enabling Act. What was involved,

therefore, was the acquisition of interests in trust lands by the State itself. The Supreme Court of Arizona held that it could be presumed conclusively that highways constructed across trust lands always enhanced the value of the remainder in amounts at least equal to the value of the areas taken and therefore refused to order the Highway Department to compensate the trust. *State* v. *Lassen*, 99 Ariz. 161, 407 P. 2d 747 (1965). This Court unanimously reversed. In so doing, it observed that the more recent federal grants to newly admitted States, including Arizona, "make clear that the United States' has a continuing interest in the administration of both the lands and the funds which derive from them." 385 U. S., at 460.

The Court read § 28 of the Enabling Act with particularity. It emphasized the Act's requirements that trust lands be sold or leased only to " 'the highest and best bidder' "; that no lands be sold for less than their appraised value; that disposal of trust lands be " 'only in manner as herein provided' "; that disposition in any other way " 'shall be deemed a breach of trust' "; and that every sale or lease " 'not made in substantial conformity with the provisions of this Act shall be null and void.' " 385 U. S., at 461–462. The Court then examined the purposes of the Act and concluded that the grant "was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the State could support the public institutions designated by the Act." *Id.*, at 463. Sales and leases were intended. The "central problem" was "to devise constraints which would assure that the trust received in full fair compensation for trust lands." *Ibid.* The Court concluded, for reasons stated in the opinion, that the Act's procedural restrictions did not apply when the State itself sought trust lands for its highway program.

The Court then turned to the standard of compensation Arizona must employ to recompense the trust for the interests the State acquired. It concluded that the terms and purposes of the grant did not permit Arizona to diminish the actual monetary compensation payable to the trust by the amount of any enhancement in the value of remaining trust lands. The Court emphasized that the Enabling Act "unequivocally demands both that the trust receive the full value of any lands transferred from it and that any funds received be employed only for the purposes for which the land was given." *Id.,* at 466. It again stressed the requirements of the Act and noted that "these restrictions in combination indicate Congress' concern both that the grants provide the most substantial support possible to the beneficiaries and that only those beneficiaries profit from the trust." *Id.,* at 467. All this was confirmed by the background and legislative history of the Enabling Act. Accordingly, it held that even where the State itself is the acquisitor, the Act's designated beneficiaries were to derive the full benefit of the grant. Thus, "Arizona must actually compensate the trust in money for the full appraised value of any material sites or rights-of-way which it obtains on or over trust lands." *Id.,* at 469 [7] (footnotes omitted). This standard, it was said, "most consistently reflects the essential purposes of the grant." *Id.,* at 470.

Much of what was said in *Lassen* had also been said, several decades earlier, in *Ervien* v. *United States,* 251 U. S. 41 (1919), when the provisions of the same Enabling Act were under consideration in a federal case from New Mexico. The Court's concern for the integrity of the conditions imposed by the Act, therefore, has long been evident.

---

[7] The full-value provision does not exclude an appropriate deferred-payment arrangement. 385 U. S., at 469, n. 21.

But to say, as the Court did in *Ervien* and in *Lassen*, that the trust is to receive the full value of any lands transferred from it is not to say that the Act requires, in every Arizona case where a leasehold is outstanding at the time of the federal condemnation, that the trust is to receive the entire then value of the land and the possessor of the leasehold interest is to receive nothing whatsoever. What the Act requires—and we think that this is clear from *Ervien* and *Lassen*—is that the trust is to receive, at the time of its disposition of any interest in the land, the then full value of the particular interest which is being dispensed.

It has long been established that the holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment,[8] to just compensation for the value of that interest when it is taken upon condemnation by the United States. *United States* v. *Petty Motor Co.*, 327 U. S. 372 (1946); *A. W. Duckett & Co.* v. *United States*, 266 U. S. 149 (1924). See *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945); *Almota Farmers Elevator & Warehouse Co.* v. *United States*, 409 U. S. 470 (1973); 2 P. Nichols, Eminent Domain § 5.23 (Rev. 3d ed. 1975); 4 *id.* § 12.42 [1]. It would therefore seem to follow that when a lease of trust land is made, the trust must receive from the lessee the then fair rental value of the possessory interest transferred by the lease, and that upon a subsequent condemnation by the United States, the trust must receive the then full value of the reversionary interest that is subject to the outstanding lease, plus, of course, the value of the rental rights under the lease. The trust should not be entitled, in addition to all this, to receive the compensable value,

---

[8] "[N]or shall private property be taken for public use, without just compensation."

if any, of the leasehold interest. That, if it exists and if the lease is valid, is the lessee's. See *State ex rel. La Prade* v. *Carrow,* 57 Ariz. 429, 433–434, 114 P. 2d 891, 893 (1941).

Ordinarily, a leasehold interest has a compensable value whenever the capitalized then fair rental value for the remaining term of the lease, plus the value of any renewal right, exceeds the capitalized value of the rental the lease specifies. The Court has expressed it this way:

> "The measure of damages is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . , less the agreed rent which the tenant would pay for such use and occupancy." *United States* v. *Petty Motor Co.,* 327 U. S., at 381.

See *Almota Farmers Elevator & Warehouse Co.* v. *United States, supra.* A number of factors, of course, could operate to eliminate the existence of compensable value in the leasehold interest. Presumably, this would be so if the Enabling Act provided, as the New Mexico-Arizona Act does not, that any lease of trust land was revocable at will by the State, or if it provided that, upon sale or condemnation of the land, no compensation was payable to the lessee. The State, of course, may require that a provision of this kind be included in the lease. See *United States* v. *Petty Motor Co.,* 327 U. S., at 375–376, and n. 4; see also 4 Nichols, *supra,* § 12.42 [1], pp. 12–488 and 12–489.

A difference between the rental specified in the lease and the fair rental value plus the renewal right could arise either because the lease rentals were set initially at less than fair rental value, or because during the term of the lease the value of the land, and consequently its fair rental value, increased. The New Mexico-Arizona En-

abling Act has a protective provision against the initial setting of lease rentals at less than fair rental value. This is specifically prohibited by § 28. The prohibition is given bite by the further very drastic provision that a lease not made in substantial conformity with the Act "shall be null and void." Thus, if the lease of trust lands calls for a rental of substantially less than the land's then fair rental value, it is null and void and the holder of the claimed leasehold interest could not be entitled to compensation upon condemnation.

On the other hand, the fair rental value of the land may increase during the term of the lease.[9] If this takes place, the increase in fair rental value operates to create a compensable value in the leasehold interest. It is at this point, we feel, that the Court of Appeals erred when it held that the Act by its terms, and apart from the extent to which it incorporated Arizona law by reference, barred Arizona from leasing trust land in any manner that might result in the lessee's becoming constitutionally entitled to just compensation for the value of its unexpired leasehold interest at the time of the federal condemnation. Instead, the Act is completely silent in this respect.

### III

Arizona, however, suggests that this usually acceptable analysis may not be applied under the New Mexico-Arizona Enabling Act. It argues, as the Court of Appeals held, 495 F. 2d, at 14, that under that Act the State, as trustee, has no power to grant a compensable prop-

---

[9] The Arizona statutes governing grazing leases of trust lands recognize this possibility and provide for adjustment of rent at specified times to account for fluctuations in fair rental value. Ariz. Rev. Stat. Ann. §§ 37–283, 37–285 (1974). Indeed, under § 28 of the Enabling Act, at the termination of a lease, a re-evaluation would appear to be required before release or renewal.

erty interest to Alamo, as lessee. It bases this thesis
on the Enabling Act's provision in § 28 that no "mortgage
or other encumbrance" of trust land shall be valid, and it
claims that a lease is an encumbrance, citing, among
other cases, *Hecketsweiler* v. *Parrett,* 185 Ore. 46, 52, 200
P. 2d 971, 974 (1948) (agreement to sell real estate free
and clear of encumbrances), and *Hartman* v. *Drake,* 166
Neb. 87, 91, 87 N. W. 2d 895, 898 (1958) (partition).
One seemingly apparent and complete answer to this
argument is that § 28 goes on to authorize specifically a
lease of trust land for grazing purposes for a term of 10
years or less, and further provides that a leasehold, before
being offered, shall be appraised at "true value." See
n. 2, *supra.* These provisions thus plainly contemplate
the possibility of a lease of trust land and, in so doing,
intimate that such a lease is not a prohibited "mortgage
or other encumbrance." [10]  Furthermore, Arizona stat-
utes in other contexts specifically protect the lessee's
interest. Ariz. Rev. Stat. Ann. §§ 41–511.06, 37–291
(1974). See *Ehle* v. *Tenney Trading Co.,* 56 Ariz. 241,
107 P. 2d 210 (1940). To this the State responds that,
while a lease is possible, it falls short of being a compen-
sable interest when the property is sold because the Act
prohibits the sale unless the trust receives the full ap-
praised value of the land. The argument assumes that
such compensation is to be measured by the entire land
value despite the presence of the outstanding lease.
That approach overlooks the actuality of a two-step dis-

---

[10] The Supreme Court of New Mexico long ago ruled that a
grazing lease of state lands is not a "mortgage or . . . encumbrance,"
within the meaning of the identical prohibition, applicable to New
Mexico, in § 10 of the New Mexico-Arizona Enabling Act, 36 Stat.
563. *American Mortgage Co.* v. *White,* 34 N. M. 602, 605–606,
287 P. 702, 703 (1930). See *United States* v. *40,021.64 Acres of
Land,* 387 F. Supp. 839, 848–849 (NM 1975); *State ex rel. State
Highway Comm'n* v. *Chavez,* 80 N. M. 394, 456 P. 2d 868 (1969).

position of interests in the land, the first at the time of the granting of the lease, and the second at the time of the condemnation. Full appraised value is to be determined and measured at the times of disposition of the respective interests, and if the State receives those values at those respective times, the demands of the Enabling Act are met. The State's argument would serve to convert and downgrade a 10-year grazing lease, fully recognized and permitted by the Act, into a lease terminable at will or into one automatically terminated whenever the State sells the property or it is condemned. The lessee is entitled to better treatment than this if neither the Enabling Act nor the lease contains any such provision. We have noted above that the Act or the lease, or both, could provide for that result. The Act, however, does not specifically so provide. Whether either the Act or the lease does so through incorporation of state law is an issue not addressed by the Court of Appeals, and it is to be considered on remand. We merely note that the fact that it is within Arizona's power to insert a condemnation clause in a lease it makes of trust land does not mean that the State may claim the same result when its lease contains no such clause.

## IV

Alamo suggests that the Court of Appeals' decision is at odds with the above-cited case of *Nebraska* v. *United States,* 164 F. 2d 866 (CA8 1947), cert. denied, 334 U. S. 815 (1948). There, in the face of a totality claim like that made by Arizona here, the Eighth Circuit ruled that trust lands in Nebraska were to be treated as any other property and that condemnation proceeds were subject to allocation between the State as trustee and the holder of an outstanding agricultural lease. The Nebraska Enabling Act of April 19, 1864, c. 59, 13 Stat. 47, was an earlier edition of this type of statute, and was adopted

more than four decades before the New Mexico-Arizona Act. It did not contain the detailed restrictive provisions that appear in the 1910 Act and that were developed and utilized as passing years and experience demonstrated a need for them. Because of this, one may say, as Arizona does, that the *Nebraska* case is distinguishable from the present one. But the decision is not devoid of precedential value, for it is consistent with our analysis of the New Mexico-Arizona Act in its recognition of the possibility of a compensable leasehold interest in trust land upon federal condemnation, and it demonstrates that the existence of that interest is not incompatible with the trust land concept. See also *United States v. 78.61 Acres of Land*, 265 F. Supp. 564 (Neb. 1967), a post-*Lassen case; United States v. 40,021.64 Acres of Land*, 387 F. Supp. 839, 848–849 (NM 1975).

## V

Finally, the Court of Appeals observed, but only in passing, 495 F. 2d, at 14, that the lease recited that it was made subject to the laws of Arizona; that if the State "relinquished" the property to the United States, the lease "shall be null and void as it may pertain to the land so relinquished"; and that no provision of the lease "shall create any vested right in the lessee." The court also observed, *ibid.*, that Ariz. Rev. Stat. Ann. § 37–242 and 37–293 [11] restrict a lessee's participation in the

---

[11] § 37–242:

"A. When state lands on which there are improvements for which the owner thereof is entitled to be compensated are offered for sale, and the purchaser is not the owner of the improvements, the purchaser shall pay the person conducting the sale ten percent of the appraised value of the improvements and the balance within thirty days thereafter. If the state land department determines that the amount at which the improvements are appraised is so great that competitive bidding for the land will be thereby hindered, the

proceeds of a sale of public land to the value of improvements. Having made these observations, however, the court thereupon concluded that it did not find it neces-

department may sell the improvements on installments payable ten per cent upon announcement of the successful bidder, fifteen per cent thirty days thereafter, and fifteen per cent annually thereafter for five years, together with six per cent interest on the balance remaining unpaid, which amount, until paid, shall be a lien upon the land. The purchaser shall at all times, keep the insurable improvements insured for the benefit of the state. Payments shall be made at the time and in the manner prescribed for payments on the land, and any default in the payments for improvements shall be deemed a default in the payments for the land.

"B. When improvements are sold on installments, the first twenty-five per cent, after deducting all rents, penalties and costs owing to the state on account of the land, shall be paid to the owner of the improvements, and the balance shall become a legal charge against the state.

"C. Upon surrendering possession of any such land, the owner of the improvements thereof shall file with the commissioner of finance his claim for the balance on the improvements remaining unpaid, and if the claim bears the approval of the department as to correctness, and a certificate that possession of the lands and improvements has been surrendered by all persons having lawful claims for improvements on the land, it shall be paid by the state treasurer on the warrant of the commissioner of finance from any fund in which there is money subject to investment. As payments for the improvements are made by the purchaser, they shall be deposited with the state treasurer and both principal and interest shall be returned by him to the fund from which they were taken.

"D. Failure to pay the balance of the purchase price or the fifteen per cent within thirty days after the announcement of the successful bidder shall constitute a forfeiture of all rights to the land and all payments made."

§ 37–293:

"A. A lessee of state lands shall be reimbursed by a succeeding lessee for improvements placed on the lands which are not removable. If the retiring lessee and the new lessee do not agree upon the value of the improvements, either party may file with the state

sary "to determine the rights of Alamo based upon these lease provisions or the state law." 495 F. 2d, at 14.

The significance of the provisions referred to and of the cited statutes will now be for determination upon remand. We note only that the land in question was condemned and thus does not appear to have been technically "relinquished" by Arizona to the United States; that we are not at all sure that there is language of restriction in §§ 37–242 and 37–293; and that Ariz. Rev. Stat. Ann. §§ 37–288 and 37–290 respectively permit forfeiture for violation of the conditions of a lease or for nonpayment of rent, and cancellation of a lease if the leased land is reclassified to a higher use, and thus could explain the lease's provision against vesting in the technical sense that it is not subject to any contingency whatsoever.

---

land department an application for appraisal of the improvements. Thereafter an appraisal of the improvements shall be made in the same manner and subject to the same conditions as appraisals of improvements are made when state lands are sold.

"B. Upon making the appraisal, the department shall give notice of the amount thereof by registered mail to each person interested in the appraisal. The notice shall require that the new lessee pay to the department for the prior lessee the entire amount of the appraisal within thirty days from the date of the notice, or the department, when the value is greater than the rental for the period of the lease, may require that payment of ten per cent of the appraised value be made within thirty days, fifteen per cent within sixty days, twenty-five per cent at the end of the first year of the new lease, and twenty-five per cent at the end of each year thereafter until the entire balance is paid.

"C. If the improvements are not paid for as required in the notice, the succeeding lessee shall not be permitted to sell, assign, or transfer his lease, nor sell, assign or remove any improvements whatever from the land until the entire amount of the appraised value of the improvements has been paid. Upon default he shall be subject to the same penalties and liabilities as provided by § 37–288 for failure to pay rents, including a cancellation of the lease."

To repeat: we hold that nothing in the Enabling Act apart, possibly, from the extent it may incorporate Arizona law by reference, prevents the usual application of Fifth Amendment protection of the outstanding leasehold interest. We leave for determination on remand the following: (1) whether, under state law and the lease provisions, Alamo could not possess a compensable leasehold interest upon the federal condemnation; (2) if Alamo did possess such an interest, how it is properly to be evaluated and calculated (with the subsidiary questions of the relevance of possible lease renewals [12] and of possible value additions by reason of Alamo's development of adjoining properties, cf. *United States* v. *Fuller,* 409 U. S. 488 (1973)); and, (3) if that interest proves to be substantial, whether it is permissible to find from that fact a violation of the Enabling Act's requirement that a lease, when offered, "shall be appraised at [its] true value" and be given at not less than that value.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN joins, dissenting.

The question in this case is whether, under § 28 of the

---

[12] We note in regard to the possible value of renewal rights that leases of the kind in issue here are limited by statute to 10 years in duration, and that the Act requires that rentals be adjusted to reflect current fair rental value before any renewal. See n. 9, *supra.* Therefore, although we do not foreclose the relevance of possible renewals, the calculation of the lessee's interest cannot include the prospect of renewing the lease at less than fair rental value.

New Mexico-Arizona Enabling Act, 36 Stat. 574, the State of Arizona had the power to grant to petitioner a compensable leasehold interest in the property in issue. The question is solely one of statutory construction. As I agree with the Court of Appeals for the Ninth Circuit that Congress intended that lessees of land covered by the Act should acquire a compensable interest in leased land only to the extent of "improvements . . . placed thereon by such lessee," *United States* v. *2,562.92 Acres of Land,* 495 F. 2d 12, 14 (1974), I dissent.

The Act states expressly, with respect to the lands involved here, that "no mortgage or other encumbrance of the said lands . . . shall be valid in favor of any person or for any purpose or under any circumstances whatsoever." A lease, if not terminable at will by the State or terminable automatically upon sale or condemnation, is clearly an "encumbrance." 7 G. Thompson, Real Property § 3183, p. 277 (1962); 2 Bouvier's Law Dictionary 1530 (8th ed. 1914). A lease not so terminable is, therefore expressly prohibited by the Act. The majority opinion, however, finds implicit in the Act an exception to the express ban on encumbrances in the case of leases for terms of 10 years or less. It points to the fact that 10-year leases of school trust lands are expressly permitted by the Act and states that to treat a lease as an "encumbrance" under the circumstances would be to "downgrade a 10-year grazing lease, fully recognized and permitted by the Act, into a lease terminable at will or into one automatically terminated whenever the State sells the property or it is condemned." *Ante,* at 307. Treating the lease as an encumbrance would certainly have the effect which the majority says it would. The majority does not disclose, however, why such an effect is contrary to the intent of the Act. Apparently, it simply finds illogical

the notion that a lease could be terminable on sale or condemnation and still be a "10-year" lease, notwithstanding the fact that treating 10-year leases as being so terminable is the only way to square them with the Act's unqualified ban on encumbrances.

It is Congress' policy, however, and not our own which we must apply to the Act; and Congress' prior statutes governing leases by States of school trust lands granted to them by the United States strongly support the proposition that Congress viewed an express statutory provision permitting leases of such land for a term of years as entirely consistent with provisions making such leases terminable at will or by sale or condemnation. In 1888 Congress provided, with respect to school trust lands granted to Wyoming, that the lands could be leased for 5-year periods but that such leases could be annulled at will by the Secretary of the Interior. 25 Stat. 393. Of far more significance to this case was Congress' treatment of the lands granted to Oklahoma— the State to enter the Union most recently prior to the entry of Arizona and New Mexico—in the Oklahoma Enabling Act. C. 3335, 34 Stat. 267. In that Act, Congress expressly provided Oklahoma with the authority to lease school trust lands for 10-year periods while also clearly providing that upon sale of the lands during the period of the lease, the lessee would receive only the value of its improvements. That Act states with respect to sales of lands subject to a lease that "preference right to purchase at the highest bid [is] given to *the lessee at the time of such sale*," *id.*, at 274 (emphasis added); and then provides:

> "[I]n case the leaseholder does not become the purchaser, the purchaser at said sale shall, under such rules and regulations as the legislature may prescribe, pay to or for the leaseholder the appraised value

of . . . improvements, *and to the State the amount bid for said lands, exclusive of the appraised value of improvements . . . ." Ibid.* (emphasis added).

The Oklahoma Enabling Act thus clearly provides for the result which the majority finds so illogical and which it declines for that reason alone to attribute to Congress under the New Mexico-Arizona Enabling Act passed only four years later. Moreover, in the single piece of legislative history shedding any light on the relevant portion of the Act, the Senate sponsor of the Act—Senator Beveridge—spoke approvingly of the restrictions placed on Oklahoma in dealing with school trust lands granted to it in the Oklahoma Enabling Act and indicated his belief that the restrictions on Arizona and New Mexico were more stringent. He stated:

> "We took the position [in drafting the Act] that the United States owned this land, and in creating these States we were giving the lands to the States for specific purposes, and that restrictions should be thrown about it which would assure its being used for those purposes."

> . . . .

> "We have thrown conditions around land grants in several States heretofore, notably in the case of Oklahoma, but not so thorough and complete as this." 45 Cong. Rec. 8227 (1910).

The Oklahoma Enabling Act prevents the creation of a compensable interest in a lessee of school trust lands except to the extent of improvements placed thereon by him. A literal application of the New Mexico-Arizona Enabling Act at issue here reaches the same result. The latter Act, passed only four years after the Oklahoma Enabling Act, had purposes similar to those of the former. I cannot but conclude that it should also be

construed to prevent the creation of a compensable interest in leaseholds of school trust lands.

Congress' reasons for so limiting the rights of lease-holders is easily discernible from the Act and its legislative history. Congress anticipated that the value of the school trust lands would increase over time and it intended that the *schools,* not leaseholders, benefit from this increase. Pursuing this end, the Act set a minimum sales price for school trust lands of $3 per acre, 36 Stat. 574, the House committee report explaining:

> "The bill fixes a minimum price at which the lands granted for educational purposes subject to sale may be sold. . . .
>
> "It is recognized by the committee as well as by other earnest advocates of a minimum price, that practically none of these lands are worth now anything like the minimum price fixed. . . . It is believed, however, that the advance of science, the extension of public and private irrigation projects, and the tendency toward the higher development of smaller holdings will, in the case of Arizona and New Mexico, as in the case of other States, *result in a sure, although possibly slow, increase of land values.*
>
> "The educational lands which are subject to sale would probably not bring on the market now much more than 25 cents an acre, but if the history of other states in which minimum prices, which at the time were considered prohibitive, were fixed shall be repeated in Arizona and New Mexico, it is of the utmost importance that some restriction be placed upon the sale of these lands.
>
> "The experience of other States and the importance of fixing a minimum selling price for educational lands is indicated in the following extract

from a letter from former Secretary of the Interior Garfield addressed to the chairman of the committee in the last Congress:

" 'The history of the public-land States in the matter of the disposal of granted school lands has convinced me that those States which have a minimum price fixed on their lands granted for educational purposes get a much larger return from their lands. I am informed that most States with no minimum have not disposed of their lands to the best advantage, thus seriously failing to derive the full benefit to which the schools are entitled. The States of North and South Dakota, Montana, Wyoming, Idaho, and Washington have a $10 minimum fixed on their lands, and I am informed that none of these States, unless it is Wyoming, feels that this high minimum is harmful.

" 'On the contrary, I find that officials of these States are zealous and proud of the splendid school funds which they are creating from the sale of school lands. North Dakota, which a few years ago seemed to contain immense areas of poor land, is, I am informed, obtaining in many cases $15 or $20 per acre for its school sections. Colorado seems to have an exceedingly low minimum, $2.50; and nevertheless it has administered its land grants unusually well, securing from them very large returns, both from sales and from leases. For these reasons, I urge that a minimum price be fixed for these proposed new States. They will be able to lease most of their land, if it is not worth to-day the minimum price, and will thereby obtain an income.' " H. R. Rep. No. 152, 61st Cong., 2d Sess., 2–3 (1910).

If leases were permitted to encumber school trust lands

at a time when they were worth less than the minimum sales price, then when the land rose in value—as Congress anticipated it would—and was sold for the minimum price or more, the State would have to give part of such sales price to the lessee. Such a result is utterly irreconcilable with the reasons for setting minimum sales prices. Plainly, Congress intended the school trust to receive the *full* sales price and to prevent the States from disposing of the lands in any fashion which would result in its receiving any less. Lessees were to receive none of the proceeds of sale of the land itself even if the land had appreciated in value subsequent to the creation of the lease.

To make its purpose even clearer, Congress, in dealing with the very question of whether the lessee should share in the proceeds when lands subject to the lease are sold, provided:

> "Nothing herein contained shall prevent . . . (4) the Legislature of the State of Arizona from providing by proper laws for the protection of lessees of said lands, whereby such lessees shall be protected in their rights to their improvements (including water rights) in such manner that in case of lease or sale of said lands to other parties the former lessee shall be paid by the succeeding lessee or purchaser the value of such improvements and rights placed thereon by such lessee." 65 Stat. 52.

The Act provides for no other kind of compensation to the lessee of lands sold. Under the majority opinion a lessee could, if the value of the lands increased after the lease was entered into, and if the lease had not expired at the time of any sale or condemnation, receive a portion of the sale or condemnation price over and above the value of any improvements. In *Lassen* v. *Arizona*

*ex rel. Arizona Highway Dept.*, 385 U. S. 458, 466 (1967), we said that Act "unequivocally demands . . . that the trust receive the full value of lands transferred from it." The majority now construes the Act to authorize a result contrary to the Act's "unequivocal demand" and, accordingly, I dissent.