PENNSYLVANIA AVENUE DEVELOP-MENT CORPORATION, Plaintiff,

v.

ONE PARCEL OF LAND IN the DISTRICT OF COLUMBIA et al., Defendants.

Civ. A. No. 79–2645.

United States District Court,
District of Columbia.

March 21, 1980.

---

J. Hampton Baumgartner, Jr., Stanley J. Fineman, Charles A. Camalier, III, Washington, D.C., for trustees of Estate of Henry K. Willard, owner.

J. Roy Thompson, Jr., Julian E. Markham, Jr., Washington, D.C., for Metropolitan Parking Inc., Lessee.

Robert E. Cohn, Washington, D.C., for Gal-Tex Hotel Corp. d/b/a Hotel Washington.

Robert J. Harlan, Jr., Washington, D.C., for District of Columbia.

C. Keith McLendon, John D. Gilmore, Jr., Hyattsville, Md., for Elenora Shaffer Carson, successor in interest to E. Whyland Shaffer.

## MEMORANDUM OPINION

### JOHN H. PRATT, District Judge.

In this condemnation action, plaintiff Pennsylvania Avenue Development Corporation has deposited $1,415,000 in the court registry as estimated compensation for the taking in fee simple absolute of certain land and improvements in the District of Columbia. This case is before us on the motion of defendant Trustees of the Estate of Henry K. Willard for allocation and distribution of these funds and on motions for partial summary judgment by defendants Metropolitan Parking, Inc. and Gal-Tex Hotel Corporation. We must determine who is entitled to a share of the condemnation award. For the reasons discussed below, we have determined that only the owner of the property in fee simple absolute at the time of the condemnation, defendant Trustees, are entitled to the condemnation award.

## FACTS

On October 3, 1979, plaintiff Pennsylvania Avenue Development Corporation filed a Complaint for Condemnation and a Declaration of Taking and acquired title in fee simple absolute to the land and premises described on the Records of the Assessor of the District of Columbia as Lot 31, Square 225, located in the District of Columbia. On that date plaintiff also deposited $1,415,000 in the registry of the court as estimated compensation for the taking.[1]

The property at issue, which is being taken in implementation of the development plan for the Pennsylvania Avenue Development Area, is located at 1416 F Street, Northwest, and is now used as a parking garage. At the time of the taking, defendant Trustees of the Estate of Henry K. Willard (hereinafter "Trustees") owned the land in fee simple absolute. Defendant Metropolitan Parking, Inc. (hereinafter "MPI"), an assignee of the original lessee,[2] leased the premises and operated the parking garage. The lease, dated November 25, 1952, provided for a term of 25 years with an option to renew for an additional ten years. The option was exercised, extending the lease to June 30, 1988. MPI seeks compensation for the value of its leasehold while defendant Trustees seek the entire compensation award.

Another defendant claiming a share of the compensation award is Gal-Tex Hotel Corporation, owners and operators of the Hotel Washington, which is located adjacent to the parking garage on Lot 30 of Square 225. Gal-Tex's interest stems from an agreement dated September 24, 1953 between MPI and a predecessor to Gal-Tex, granting such predecessor certain rights of ingress and egress to the parking garage through an entranceway connecting the hotel lobby with the parking garage. The agreement was to run concurrently with the terms of the lease between defendants Trustees and MPI.

Also claiming a share in the compensation award is defendant Elenora Shaffer Carson, successor in interest to E. Whyland Shaffer, one of the two agents designated in Article 3 of the lease to jointly receive a monthly commission during the term of the lease.[3]

Defendant Trustees have moved for allocation and distribution of funds, requesting an order that the entire condemnation award be paid to them. The other defendants—each claiming a share of the condemnation award—have opposed complete dis-

1. Defendants have not waived their right to seek compensation in addition to that paid into the registry of the court.

2. The original lessees were Washington Garage Company, Inc. and H Street Building Corporation.

3. The lease provides that a 5% commission is to be paid to the two agents, ". . . their heirs, personal representatives, or assigns . . . ." Pursuant to a Division Order and Release dated November 28, 1952, the agent directed the lessors to pay each of them separately one-half the commission monthly during the term of the lease.

tribution to lessors. Defendants MPI and Gal-Tex have moved for partial summary judgment, seeking a judgment that they are entitled as a matter of law to share in the condemnation award.[4] We must therefore determine who is entitled to a share of the condemnation award.

## ANALYSIS

### 1. *Interest of MPI*

■ Defendant MPI, whose lease on the condemned premises expires June 30, 1988, argues that it is entitled as a matter of law to be compensated for its leasehold interest. It correctly asserts that it is well-established that ". . . the holder of an unexpired leasehold interest in land is entitled . . . to just compensation for the value of that interest when it is taken upon condemnation by the United States." *Alamo Land and Cattle Co. v. Arizona*, 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976). *See United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *A. W. Duckett & Co. v. United States*, 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216 (1924). On the other hand, it is also recognized that a lessee may be barred from receiving a share of the condemnation award by a provision in the lease generally referred to as a condemnation clause. *See United States v. Petty Motor Co., supra*, and the cases cited in footnote 5 at 376, 66 S.Ct. at 599. Such clauses specifically provide that if the property should be taken by eminent domain for public use, in whole or in part, the lease term shall come to an end. Under such clauses, the tenant has no estate or interest surviving the condemnation which entitles him to a portion of the condemnation award.

To determine whether defendant MPI, the lessee, is barred from receiving a portion of the condemnation award by the terms of its lease with the lessor, we focus on the following provisions of the lease:

## ARTICLE I

## DEFINITIONS

For the purposes hereof, unless the context otherwise requires:

. . . . .

Section 1.04. Any reference herein to the termination of this lease shall be deemed to include any termination hereof by expiration, default, or otherwise.

. . . . .

## ARTICLE 20

## IMPROVEMENTS VEST IN LESSORS UPON TERMINATION

Section 20.01. Upon termination of this lease by default, lapse of time, or for any reason, all of the right, title and interest of Lessee in and to the premises and the leasehold estate created hereby shall automatically vest in Lessors without the execution of any further instrument, free and clear of all liens and encumbrances (other than those, if any, created by Lessors), but Lessee, nevertheless, shall on demand execute such further assurances of title as may be requisite.

It is clear that none of these provisions constitutes an *explicit* "condemnation clause." The question facing us is whether these provisions, although not constituting an explicit condemnation clause, nevertheless serve to bar the lessee from any portion of the condemnation award.

At this point we find it appropriate to comment upon our method of analysis in determining this issue. The briefs before us are ripe with maxims and rules of construction purporting to point our way toward the proper rule of law on the instant facts.[5] The difficulty is, as some commen-

---

4. Defendant Trustees have opposed the motions for summary judgment on the basis that they are improper under Rule 71A(j), Fed.R. Civ.P., which directs that attorneys shall expedite the distribution proceeding. We find defendant Trustees' objection on the ground stated to be without merit.

5. We note that no party has cited precedent in this jurisdiction controlling on the issue in question, and we can find none.

tators have noted,[6] that for almost every maxim which would lead a court to one conclusion there is a counter-maxim which would lead that same court to a different conclusion, and for a rule of construction pointing in one direction there is often another rule pointing in the opposite direction. The result is that antagonists in the same battle are able to arm themselves to the teeth with maxims and rules of construction which clash head-on with each other, generating a great deal of heat but little light to guide the court.

Without a framework of analysis, unwary courts may be, and occasionally have been, we believe, lead into the trap of basing a judicial holding on a quicksand of generalities, which have regrettably taken on a life of their own in the law.[7] In this regard, we also note that the parties have cited treatises for broad general propositions in support of their arguments. After careful research of the cited sections, however, we have found that in some instances the strongest or only real support for the generalities expounded in the treatises are in cases which have relied on the treatise(s) as authority.

 Mindful of these pitfalls, we have decided to follow the framework of contract analysis outlined in the *Restatement of Contracts* in interpreting the lease before us.[8] We do so because we believe a logical framework of analysis is essential at the outset if we are to place the mountain of maxims and rules of construction in their proper perspective and in their proper place. We also select this framework for analysis because we are convinced that the guidelines we follow here are most likely to result in achieving our goal—ascertaining and giving effect to the intention of the parties *as expressed in their writing. Liberty National Bank and Trust Company v.*

*Bank of America National Trust and Savings Association, et al.,* 218 F.2d 831 (10th Cir. 1955). *In accord E. P. Hinkel and Company, Inc. v. Manhattan Co.,* 506 F.2d 201 (D.C.Cir. 1974); *Tow v. Miners Memorial Hospital Association,* 305 F.2d 73 (4th Cir. 1962); *Henson Creek Development Corp. v. Richards,* 296 F.Supp. 915 (D.D.C. 1969).

 To determine the intent of the parties, we attach to the words in question the ordinary meaning which would be given them by a reasonably intelligent person familiar with the circumstances of the transaction (other than oral statements of the parties as to their subjective intent) and familiar with the operative usage of the language employed. *Restatement of Contracts,* § 230 (1932). In seeking to attach this meaning to the writing of the parties, we will give to language its ordinary meaning unless circumstances show a different meaning is applicable, we will use technical terms and words of art in their technical sense unless circumstances indicate a different meaning, and we will interpret the writing as a whole and interpret the words of the lease together with the writing as a whole. *Restatement, supra,* § 235.

These primary standards of interpretation must, we believe, be applied every time a court views a contract. If, after application of the primary rules of interpretation, the terms of the contract are clear and unambiguous, manifesting the intent of the parties, our inquiry is at an end. We then merely give force and effect to the parties' own words. "It is an elementary principle of contract interpretation that the plain and unambiguous meaning of a written agreement is controlling, in the absence of some clear evidence indicating a contrary intention." *Vogel, et al. v. Tenneco Oil Company,* 465 F.2d 563, 565 (D.C.Cir. 1972).

**6.** *Patterson, The Interpretation and Construction of Contracts,* 64 Colum.L.Rev. 833 (1964); 3 Vanderbilt L.Rev. 395 (1950).

**7.** The unquestioning acceptance of legal generalities or maxims can be described as following the "Kimono approach"—they cover everything but frequently touch very little.

**8.** Although the proposed *Restatement (Second)* suggests some changes in the guidelines for interpretation of a contract, none would materially alter the results of our analysis here.

In beginning our interpretation of the provisions in dispute, we note that it appears well-established that a condemnation of the entire leased premises, as here, constitutes a termination of the leasehold. *Lodge v. Columbia Packing Co.*, 162 F.Supp. 483 (D.Mass.1958); *Newman v. Commonwealth*, 336 Mass. 444, 146 N.E.2d 485 (1957); *O'Brien v. Ball*, 119 Mass. 28 (1875); *cf. A. W. Duckett and Co. v. United States*, 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216 (1924); *Kohl v. United States*, 91 U.S. 367, 23 L.Ed. 449 (1876); *Bahouth v. State of New York*, 26 Misc.2d 494, 211 N.Y.S.2d 292 (1961); *see also 3 A.L.R.2d 286* at 329 (1949); *Restatement (Second) of Property*, § 8.1(1). This necessarily follows from the concept of a total taking of the fee simple absolute by eminent domain. Such a taking extinguishes the interest of the owner in the estate because it extinguished the *res* itself. None of the parties challenge this proposition.

We are therefore led to the conclusion that the meaning of the word "termination," as used by similary situated parties whose bargaining produced a lengthy, detailed, and sophisticated long-term commercial lease *could* very well encompass termination of a leasehold interest by condemnation of the entire premises, and certainly did not exclude such an eventuality.

As for whether the parties *did* intend "termination" to encompass a termination of the lease by a complete taking in eminent domain, we turn to the language of § 20.01 of the lease, providing that all rights and interests of the lessee will automatically vest in the lessor upon termination "by default, lapse of time, *or for any reason.*" (emphasis supplied). It appears to us that the term "or for any reason" is a clear, unambiguous phrase which parties similarly situated as the lessor and lessee, aware of the surrounding circumstances, would understand to encompass *any* recognizable termination, such as a total taking by eminent domain.

Were this the only relevant clause in the lease, our inquiry would end here. However, we must also interpret § 1.04 of the lease, which defines termination as including "any termination hereby by expiration, default, *or otherwise.*" (emphasis supplied).

The phrase "or otherwise" is not as broad or inclusive as the phrase "or for any reason," possibly giving rise to some uncertainty as to the scope of the word "termination." When the meaning of the contractual provisions in dispute remains uncertain after the application of the *primary* rules of interpretation, it is appropriate to turn to the *secondary* aids to interpretation. *Restatement, supra*, § 236. Three such are applicable here.

The first is that where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions. This encompasses the well-known principle of *ejusdem generis*, which provides that where no intention to the contrary appears, general words used after specific terms are to be confined to matters of the same kind or class as the matter previously specified. *Swift and Co. v. Columbia Ry., Gas and Electric Co.*, 17 F.2d 46 (4th Cir. 1927); *Hodges v. United States Fidelity and Guaranty Corp.*, 91 A.2d 473 (Mun.Ct.App. 1952).

Defendants argue that "or otherwise" are general words limiting the word "termination" so as to include only the same *type* of termination specified in the immediately proceeding phrases (*i. e.*, "by expiration" or "by default") and to the same type of terminating events specifically provided for elsewhere in the leases. More specifically, MPI makes the following argument:

> . . . all of the enumerated happenings which could result in cessation of the leasehold flow exclusively from stated acts, actions or activities of the parties *inter se* or from the expiration of the leases (sic) term in natural course. In contrast, the event of condemnation is purely *dehors* the lease both in the sense that it is not mentioned therein and in the sense that it, unlike the specified occurrences, springs from an agency wholly a stranger to the lease. Thus,

resort to the doctrine of *ejusdem generis* does not render purposeless or nugatory the general language used by the parties; rather, its application serves only to frame the lease's terms in the intended perspective.

Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment made by defendant Metropolitan Parking, Inc., at 15.

We cannot agree. At least two of the specific lease provisions giving rise to a termination of the lease involve triggering events wholly outside the control of the parties and wholly outside the lease. One event allowing termination of the lease is the failure of the lessee, through no fault of his own, to obtain the governmental permits necessary to construct the parking garage. Section 28. Another is the inability of the lessee to obtain the materials necessary for construction because of governmental restrictions on the allocation of materials (presumably as a result of the Korean War). Section 5.02. Both of these termination events, specifically provided for in the lease, and thus included within the meaning of "or otherwise," are triggered by events wholly outside the lease and wholly outside the control of the parties. Because the phrase "or otherwise" necessarily includes these events, it cannot be seen to exclude termination by a condemnation of the entire premises, which is also an eventuality outside the lease and outside the control of the parties.

▮ Another secondary aid in interpretation which is relevant here is the guideline that an interpretation of a provision of a contract which gives it a lawful, effective and reasonable meaning is preferred over an interpretation which gives a provision an unlawful, ineffective, or unreasonable meaning. We find that reading the word "termination" to include termination by condemnation does not render any provision of the contract unlawful or ineffective.

Furthermore, we find that it is not unreasonable to interpret the word "termination" to include termination by condemnation.

Defendant MPI argues that because the lease anticipated that the lessee would construct the parking garage at its own expense for not less than $400,000, and interpretation which would allow the lessee to lose all its interest in the parking garage as the result of a taking under the power of eminent domain, perhaps immediately after construction, could not have been the intention of the parties.[9] The short answer to this is that we are bound to determine the intent of the parties *as expressed in their writing*, not their secret intent. In doing so, one of the questions we ask is whether it is unreasonable to give a particular meaning to the provision in dispute. We do not ask whether one or both of the parties were reasonable in agreeing to such a provision, just as we do not interpret provisions of a contract in such a way that they only reflect reasonable business judgment. "The mere fact that the parties have made an improvident bargain will not lead a court to make unnatural implications or artificial interpretations. The court will not under the guise of interpretation write a new contract for the parties." *Harnish v. Shannon*, 392 Pa. 419, 141 A.2d 347 (1958). It is clear to us that to interpret the word "termination" to include termination by condemnation does not give an unreasonable meaning to this word or to any provision of the lease.

The final aid to interpretation which could be relevant here is the principle that when words bear more than one reasonable meaning, an interpretation is preferred which operates most strongly against the party from whom they proceed. This principle is frequently employed in the interpretation of insurance contracts, which are usually wholly the product of the insuror. However, we are called upon here to interpret a bargained-for lease, to which both sides apparently contributed. This is not a

---

9. Though not essential to our disposition of this matter, it might also be pointed out that the parties agreed that the lessee's interest in these improvements would revert to the lessor at the end of the 25 year lease period in 1977. Therefore at the time of the condemnation, MPI had no interest in the improvements.

52

form contract, nor is it a contract wholly prepared by one side. Thus, we find this guideline of no use in our analysis.

■ From the preceding discussion, it is evident that upon application of the basic principles of interpretation, the language in dispute is clear and unambiguous. Upon termination of the lease "for any reason," the entire interest of the lessee vests in the lessor. Here, the lease was terminated by condemnation on October 3, 1979. On that date, the entire leasehold interest of defendant MPI in the premises vested in the lessor. The words "for any reason" are clear and unambiguous and we cannot read them as excluding a termination by a taking of the entire premises through eminent domain. We also find that the phrase "or otherwise" as used by the parties in the definition of "termination" encompasses a termination by condemnation of the entire premises.

Defendant MPI, despite its scholarly effort, is unable to overcome the clear meaning of the language it agreed to and we cannot read the lease any differently than it is written. As this Circuit's Court of Appeals has noted: "The mere fact that in retrospect an agreement does not seem favorable does not give the aggrieved party, a jury, or [the] court the right to reinterpret clear and unambiguous contractual language." *E. P. Hinkel and Co., Inc. v. Manhattan Co., supra* at 205.

Because we find the language upon interpretation to be clear and unambiguous, we have no reason to adopt any of the numerous rules of construction defendant has urged on us, such as "The law abhors a forfeiture," and "a lease . . . is to be construed most strongly in favor of the . . . lessee." They simply do not fit the facts of this case.

It necessarily follows that upon the termination of the lease by condemnation on October 3, 1979, MPI's leasehold interest automatically vested in the lessor with the result that MPI has no remaining compensable interest in the premises. Thus, defendant MPI is entitled to no share of the condemnation award.

· 2. *Interest of defendant Gal-Tex Hotel Corporation*

Defendant Gal-Tex Hotel Corporation, owners and operators of the Hotel Washington, claims a share of the condemnation award based on a September 24, 1953 written agreement with defendant MPI, which was to run concurrently with the lease between defendant Trustees and defendant MPI. Pursuant to the agreement, Gal-Tex was granted rights of ingress and egress to the parking garage through an entranceway connecting the hotel's lobby and the interior of the garage. Gal-Tex constructed an entranceway and a connecting hallway through the adjacent walls of the hotel in implementation of the agreement. Gal-Tex argues its compensable interest is in the nature of an easement, acquired by the agreement and also by prescription. Alternately, Gal-Tex argues it has an irrevocable license or a sublease, which are compensable interests.

The agreement on which Gal-Tex relies to establish an express easement or an irrevocable license provides in pertinent part:

This agreement shall be binding upon the parties hereto and their successors in interest so long as the premises of the party of the first part are operated for the parking of automobiles and the premises of the party of the second part are operated as a hotel, *but in no event shall the agreement be operative beyond the term of the lease held by the party of the first part or any extension under the terms of the lease.* (emphasis supplied.)

■ It is clear, from the terms of the agreement itself, that once the lease between defendants Trustees and MPI is terminated, the agreement between MPI and Gal-Tex is also terminated. The claim of Gal-Tex is wholly derivative through MPI. Thus, this agreement does not establish any compensable interest, whether an express easement or an irrevocable license, which survives the termination of the lease.

It similarly follows that if Gal-Tex had a sublease with MPI, the sublease was ended

with the termination of the lease between defendants Trustees and MPI, leaving no compensable interest.

As for Gal-Tex's argument that it has acquired an easement by prescription, it is a basic tent of property law that acquisition of an easement by prescription cannot spring from a permissive use of the premises. See the cases collected in 25 Am.Jur.2d, *Easements and Licenses*, § 54 (1966). The agreement of September 24, 1953, clearly establishes such a permissive use which prevents a prescriptive easement from coming into existence.

It is therefore clear that Gal-Tex has no compensable interest which survives a condemnation of the entire premises, and thus, as a matter of law, is not entitled to a share of the condemnation award.

### 3. *Interest of Elenora Shaffer Carson*

Defendant Elenora Shaffer Carson, as successor in interest to E. Whyland Shaffer, one of the two agents designated in the lease to receive a monthly commission, also claims a share of the condemnation award. § 3.02 of the lease provides in pertinent part:

> The rent, payable under this lease, shall be absolutely net to Lessors without deduction, abatement or setoff, except that Lessee shall not be required to pay any income taxes of Lessors, and Lessors shall pay to E. Whyland Shaffer and Percy H. Keller, agents, their heirs, personal representatives, or assigns, a commission of five percent (5%) on the amount of the monthly rent reserved and paid during the original term of this lease and during the ten (10) year renewal of said term of Lessee exercises the renewal option contained in Article 30. *Said commission shall be paid monthly by Lessors if, and at the same time that, the monthly rent is paid.* (emphasis supplied).

We believe § 3.02 is dispositive of defendant Carson's claim to a share of the compensation award. The terms of the lease clearly provide that payment of the rent is a condition precedent to payment of the monthly commission. "Where the obligation of the principal to pay commissions depends upon the performance of conditions precedent, the broker takes the risk of nonperformance on the part of the customer." *Segal Brokerage Co. v. Lloyd L. Hughes, Inc.*, 96 F.2d 208, 210 (9th Cir. 1938). Here the lease was terminated by the condemnation and thus the obligation to pay rent was terminated. Without payment of monthly rental there can be no payment of monthly commission. Thus, defendant Carson's interest in the premises is derived solely from the lease. Once the lease is extinguished, so is any compensable interest defendant Carson may have had in the premises.

It follows from the foregoing that only defendant Trustees of the Estate of Henry K. Willard are entitled to the condemnation award.

An order consistent with the foregoing has been entered this day.