764 P.2d 37

**HAVASU HEIGHTS RANCH AND DE-VELOPMENT CORPORATION, an Indiana corporation, Plaintiff–Appellant,**

v.

**The STATE LAND DEPARTMENT OF the STATE OF ARIZONA and Robert K. Lane, State Land Commissioner, Defendants–Appellees.**

**1 CA–CIV 9779.**

Court of Appeals of Arizona,
Division 1, Department A.

Sept. 27, 1988.

Reconsideration Granted Nov. 18, 1988.

**554**

Evans, Kitchel & Jenckes, P.C. by Fred
E. Ferguson, Jr., James A. Craft and Renee B. Gerstman, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by Patricia
J. Boland, Carol B. Lewin and Sandra Hafner Lee, Phoenix, for defendants-appellees.

## OPINION

JACOBSON, Judge.

This appeal is from a judgment of the superior court affirming an order of Robert K. Lane, the Arizona State Land Commissioner, refusing to accept an offer by Havasu Heights Ranch and Development Corporation (Havasu Heights) to lease state trust lands on terms different from those offered by the state land department (the "department"). The issues on appeal are (1) whether the leases offered by the department were authorized; (2) whether the department was required to promulgate rules dealing with the type of leases offered; (3) whether the leases offered by the department were void because consideration was illusory; and (4) whether this court has jurisdiction to direct the commissioner to reclassify the lands.

## FACTS AND PROCEDURAL BACKGROUND

The land in question comprises over 15,000 acres in Mohave County. Until 1974, this land was Federal Land. In 1974, it was transferred to the State of Arizona, and thereafter, the state leased the land to Havasu Heights. Since 1975 the lands have been designated as commercial lands under A.R.S. §§ 37–101(6) and 37–212(B)(4).

In 1980, the United States Congress passed the Urban Lands Act, which was subsequently adopted by the Arizona legislature. *See* A.R.S. §§ 37–331 *et seq.* (adopted by Laws 1981, 1st S.S., ch. 1, § 22, effective December 4, 1981). After this occurred, the department determined that because of the land's proximity to Lake Havasu it probably would be developed as urban land under the Act in the near future and the leases on the land would not be renewed. As a result, the department desired to leave its options open until the land's potential use became clearer. Havasu Heights nevertheless continued to express a desire to renew the leases. The department concluded that renewal of the leases would be appropriate only if the rental was high enough to justify tying up the land.

After several months of negotiations between Havasu Heights and the department, the department tendered eight leases to Havasu Heights. These leases were labeled "commercial leases," and were issued "for the purpose of holding for future commercial uses as may be approved by lessor," (popularly known as "holding leases"). The leases, by their terms, prohibited any actual current use of the land. In addition, the leases contained three "special conditions," as follows:

1. Should the State of Arizona or the Lessee request that Title 37, Chap. 2, Article 5.1 of the Arizona Revised Statutes (ARS) be made applicable to any portion of the land described herein and this lease therefore be cancelled as to that portion, Lessee waives any claim to damages under A.R.S. § 37–335.01(A) for the unexpired term of this lease or any renewal thereof, as to this portion of the

property. This waiver shall not affect any rights of the Lessee as to claims for reimbursable improvements placed as a result of this lease or prior leases on the property, nor shall it affect any rights of the Lessee as to preferential lease of reclassified land under A.R.S. § 37–335(C).

2. Interim grazing of livestock will be allowed only when Lessee applies for and obtains a 'Special Land Use Permit' for that purpose, from the State Land Department.

3. Lessor does not intend to authorize any improvements during the term of this lease, as improvements to the subject land are not considered desirable or necessary in connection with the purpose for which this lease is issued. However, if approved, the cost of any authorized improvements will be at Lessee's. sole expense. Such improvements will be amortized over the term of this lease and Lessee will have no rights to compensation for such improvements upon expiration, termination or cancellation of this lease for any reason.

When Havasu Heights received these leases, its counsel sent a letter to the department demanding that (1) special conditions one through three of the leases be eliminated; (2) Havasu Heights be given the exclusive or preferential right to conduct development planning; (3) the department give adequate assurances that the commissioner would not reclassify the land as urban land suitable for development by someone other than Havasu Heights; (4) the leases be modified to grant Havasu Heights substantial use rights or, alternatively, the amount of rent be reduced.

Counsel's letter also requested a hearing. A hearing was originally scheduled before the commissioner, but instead a meeting took place between Havasu Heights and the department. Eventually, the department treated Havasu Heights' failure to return the offered leases and counsel's letter as a rejection of the department's offer and a counteroffer. The department then rejected the counteroffer. As a result, the commissioner determined that Havasu Heights was not entitled to a hearing and issued an order that the lands were available for commercial leasing to others.

Havasu Heights first pursued an appeal pursuant to A.R.S. § 12–901 et seq. for a de novo review of the commissioner's order (Cause No. 497402). This appeal alleged the commissioner acted arbitrarily and capriciously by offering the leases in question and in re-opening the land for leasing to others. The superior court determined on cross-motions for summary judgment that: the commissioner had authority to offer the leases; the lease terms restricting commercial development did not require the department to promulgate rules; and the leases were not invalid for failure of consideration. Havasu Heights filed a timely notice of appeal to this court. In a separate action (Cause No. 516619), Havasu Heights challenged the commissioner's rejection of its proposal to reclassify the land as grazing land and to issue Havasu Heights grazing permits. The superior court dismissed this action on motion from the department, as being duplicative of, and dependent on, the resolution in Cause No. 497402. Havasu Heights timely appealed. The two cases were consolidated and on appeal we deal with all issues raised in both cases.

## SCOPE OF REVIEW

The parties appear to agree that there are no contested issues of fact essential to the resolution of this case. The disagreement is over the applicability of various statutes and legal principles to the facts. This court is free to draw its own legal conclusions and decide whether the commissioner and the trial court erred in determining issues of law. *Arizona Department of Economic Secur. v. Magma Copper Co.*, 125 Ariz. 23, 26, 607 P.2d 6, 9 (1980); *Eshelman v. Blubaum*, 114 Ariz. 376, 378, 560 P.2d 1283, 1285 (App.1977). Accordingly, we consider independently whether the land department had authority to offer the leases at issue to Havasu Heights and the consequences of Havasu Heights' rejection.

## IS THE DEPARTMENT AUTHORIZED TO OFFER THE LEASES IN QUESTION?

We first address the validity of commercial holding leases in general. Havasu Heights correctly notes that their "commercial holding" leases in reality simply authorize the lessee to hold the land for speculative purposes, as any actual use of the land is prohibited. Havasu Heights then contends that such leases are invalid because first, the land department, as an agency, had no authority to issue such leases, and second, that "holding for speculation" is not a valid commercial "use" within the meaning of A.R.S. § 37–101(6).

Under our constitution, it is the legislature which provides the authority to the executive department to lease state lands. Arizona Constitution, 1A A.R.S., Art. X, § 10. As an agency, the state land department and the commissioner have only those powers granted by the legislature. *Campbell v. Flying V Cattle Co.*, 25 Ariz. 577, 586, 220 P. 417, 420 (1923). The department has no common law or inherent powers. *Fraternal Order of Police Lodge 2 v. Phoenix Emp. Rel. Bd.*, 133 Ariz. 127, 129, 650 P.2d 429, 431 (1982). It is uncontested, however, that the legislature has delegated to the department and the commissioner the authority to classify lands as "commercial lands," A.R.S. § 37–212(B)(4), and to lease such lands. A.R.S. § 37–132(A)(6). Therefore, if we find that the leases in question are valid commercial leases, we need look no further for statutory authorization for the types of leases in question.

■ Havasu Heights contends that the offered leases are not commercial leases because they preclude any actual use of the property including commercial activities. It further asserts that the "use" referred to in A.R.S. §§ 37–281 *et seq.* means actual physical use of the land. However, A.R.S. § 37–101(6), grants the department the authority to classify as commercial lands, "lands which may be used for certain enumerated purposes *or any general purpose* other than agriculture, grazing, mining, oil, homesite or rights-of-way." In our opinion, the issue then becomes whether hold-

ing land for future speculation is an accepted "general purpose" commercial use.

The department argues that a holding lease is a valid commercial transaction which allows a lessee to "use" the land by holding the leasehold interest in speculation of future development. During his deposition, Commissioner Lane discussed the rationale behind the department's decision to issue commercial holding leases.

A. Well, it's no secret that these holding leases, one primary reason that some lessees acquire them is for speculative purposes. The department I think has been interested for years in · reducing that ability to speculate and at least the ability to make extreme profits off that speculation, recognizing that the preferred right of renewal is something in law that we can do nothing about, to use these leases where they're desired by applicants and where it makes sense to issue them, to provide more revenue to the trust. What this recognizes here is that one of the uses of these particular leases, whether we like it or not, is for speculation, and the sale of these particular leasehold properties in the marketplace are reflected in assignments, sales of these kinds of leases from time to time all over the state.

The commissioner's remarks referred to A.R.S. § 37–335 which allows an existing lessee of state land that has been reclassified for urban land development, to have a preferred right to lease the reclassified land at a rental that is not less than the highest and best bid received by the commissioner for the reclassified lease at public auction. *See* A.R.S. § 37–335(C). The commissioner's testimony and other evidence submitted by the department indicate that there is a market for leasing state trust lands primarily for investment purposes rather than for the physical use of the land because of the potential development of the land. The lessee acquires conditional rights to assign or renew the lease in the future for what he hopes will result in substantial profit.

With this in mind, Havasu Heights puts undue emphasis on the word "use" in A.R.

S. § 37–101(6). "Use" can mean actual use; that is, the act of employing or applying something. Black's Law Dictionary 1710 (4th ed. 1968); *City Council v. Canyon Ford, Inc.*, 12 Ariz.App. 595, 599, 473 P.2d 797, 801 (1970). "Use" can also mean "purpose," Black's Law Dictionary 1710 (4th ed. 1968) or "the ability or power to use something." Webster's New Collegiate Dictionary 1279 (1981 ed.). In the context of A.R.S. § 37–101(6), we hold that "use" means purpose. That section itself states that commercial lands can be used for business, institutional, religious, charitable, governmental or recreational *purposes ... or any general purpose.... See also* A.R.S. § 37–132(A)(7) (commissioner has authority to lease lands for commercial *purposes ...*); A.R.S. § 37–212(B)(4) (commissioner has authority to classify lands for commercial *purposes*). A "purpose" is merely an end, objective, plan or project. Black's Law Dictionary 1400 (4th ed. 1968). A purpose does not require actual use.

If the commissioner classifies state trust land as "commercial," the land may be used principally for "business, institutional, religious, charitable, governmental or recreational purposes, or any general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way." A.R.S. § 37–101(6). Holding for potential future profit can be reasonably construed as either a "business" purpose or "any general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way."

■ We are further supported in this conclusion by noting that pursuant to its role as trustee, the department has the duty to make the "best use" of the land. *See* A.R.S. § 37–212(C) (commissioner may reclassify lands when he determines it is in the best interest of the trust and of the state). In the present case, the commissioner testified that because of the potential development of the area surrounding Lake Havasu, the department wanted to "keep their options open." The commissioner also testified that by prohibiting improvements or actual use, it left the land available for development in any one of several directions. Keeping its options

open may, under certain circumstances be the "best use" of the land. The commissioner's discretion in this regard will not be disturbed absent an abuse of discretion. *Tanner Companies v. Arizona State Land Dept.*, 142 Ariz. 183, 193, 688 P.2d 1075, 1085 (App.1984).

■ Moreover, the commissioner also has a duty to maximize the financial benefits flowing from the trust. *Gladden Farms, Inc. v. State*, 129 Ariz. 516, 520, 633 P.2d 325, 329 (1981). Long ago, the commissioner became aware that despite the restrictions on improvements and use, the lands in question still held a value in that lessees of the land received preferred rights of renewal. *See* A.R.S. §§ 37–290, –291. With this knowledge, it was certainly not error for the department to attempt to lease the lands in question, so that the land would at least be earning income during this "waiting period" while the department decides the land's most appropriate ultimate use. In fact, *not* leasing the land under these circumstances may have been a violation of the commissioner's duties to maximize the financial benefits to the trust. *See Gladden Farms; Arizona State Land Dept. v. Superior Court*, 129 Ariz. 521, 633 P.2d 330 (1981) (sale of public lands to party other than highest bidder was violation of Enabling Act's mandate to maximize income to trust). *See also Oklahoma Ed. Ass'n v. Nigh*, 642 P.2d 230, 238 (Okla.1982) ("while the legislature does have the power to ... regulate the activities of the (state land) Commissioners, it can neither abridge nor impair their freedom to function in utmost good faith in the day-to-day discharge of their public obligation as manager of the trust estate and while acting on behalf of the State as Trustee"). For the foregoing reasons, we hold that the department and the commissioner did have the authority to enter into holding leases.

■ Having determined that the department has the authority to enter into "commercial holding leases," we now examine the validity of special conditions 1–3 contained in the offered leases. Havasu Heights contends that these three condi-

tions are all invalid as they conflict with certain constitutional and statutory rights granted to the lessee. Specifically, special condition 1 seeks to have the lessee waive any right to reimbursement for the unexpired term of a lease should the state cancel the lease and reclassify the lands pursuant to the Urban Land Act, A.R.S. § 37–335. Havasu Heights argues and the department concedes, that A.R.S. § 37–335.01(B) specifically provides that a lessee who fails to secure the reclassified lease is entitled to reimbursement for the unexpired term of the lease. Likewise, special condition 3 seeks to have lessees waive their right to reimbursement for improvements they made to the land. Havasu Heights points out that section 28 of our Enabling Act, 36 U.S.Stat. 557 (1910) (contained in the Arizona Constitution 1 A.R. S.), and A.R.S. § 37–293 specifically provide that a lessee is entitled to reimbursement for such improvements.

The department's position is that although these rights are granted by the Arizona Constitution and statutes, they can be waived as a matter of private contract negotiations with the department. We disagree. First, waivers of statutory rights are not favored. *Holden & Martin Lumber Co. v. Stuart*, 118 Vt. 286, 108 A.2d 387, 389 (1954); *Worley v. Johnson*, 60 Fla. 294, 53 So. 543, 545 (1910). Secondly, although the department has a great deal of discretion concerning the terms of the lease, the department may not act contrary to the statutory or constitutional scheme. *See* § 28 of the Enabling Act ("Every sale, lease, conveyance or contract of or concerning any lands hereby granted or confirmed ... not made in substantial conformity with the provisions of this Act shall be null and void ..."). The case of *Alamo Land & Cattle Co. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976), cited by the department, does not hold otherwise. *Alamo* involved Arizona state trust lands which had been leased to the Alamo Land and Cattle Co. During the term of the lease the land was condemned by the federal government. The issue in the case concerned the proper allocation of "just compensation" for the taking between the

State of Arizona, as the owner of the reversionary in fee, and Alamo Land and Cattle Co., as the owner of the leasehold interest. *Alamo* held that in absence of any contractual, statutory or constitutional provision to the contrary, a leasehold is a compensable interest. *Alamo* at 304, 96 S.Ct. at 916. In so holding, the *Alamo* court distinguished the case of *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946), *reh'g denied*, 327 U.S. 818, 66 S.Ct. 813, 90 L.Ed. 1040 (1946). In *Petty*, a lessee was denied any portion of condemnation proceeds paid to the owner because the lease included a provision for termination of the lease upon condemnation of the property. This provision was upheld as a matter of private contract negotiation. *Petty*, 327 U.S. at 376, 66 S.Ct. at 599. *Petty* is distinguishable from *Alamo* in several ways however. First, the lessor in *Petty* was a private party, *Petty* at 374, 66 S.Ct. at 598, while the lessor in *Alamo* was the state. *Alamo*, 424 U.S. at 296, 96 S.Ct. at 913. When statutory or constitutional rights are granted to private parties as a matter of public policy, a governmental entity may not insist on waiver of those rights. *See, e.g., City of Glendale v. Coquat*, 46 Ariz. 478, 480, 52 P.2d 1178, 1179 (1935) (city may not try to contract out of minimum wage or imply waiver of statutory right to minimum wage, because minimum wage laws, although designed to protect individual rights of private employees, are also a matter of public policy). Similarly, the protection of lessees of state lands is also a matter of public policy. *See* Enabling Act § 28 ("[t]he legislature shall provide for laws for the protection of lessees of said lands ...").

Secondly, the lease in *Alamo* did not contain a "termination upon condemnation" provision. In fact, the *Alamo* court acknowledged that because its case involved state trust lands, a provision which abrogated a lessee's right to condemnation proceeds would have to be authorized by the Enabling Act, which it was not. *Alamo*, 424 U.S. at 304, 307, 96 S.Ct. at 916, 918. Thus, the state could *not* include such a provision in its lease with Alamo Cattle Co.

Finally, both *Alamo* and *Petty*, as well as the other cases cited by the department, differ from the present case as well, in that they dealt with condemnation proceeds. Unlike the rights to reimbursement for a lease cancelled due to reclassification of the land and reimbursement for improvements, a lessee's right to condemnation proceeds is not referred to or guaranteed by the Arizona Statutes or Constitution. *Cf. Petty,* 327 U.S. at 376, 66 S.Ct. at 599 ("a termination of lease upon condemnation clause is matter for private bargaining *in the absence of a contrary state rule ...*"). In this case, we clearly have a contrary state rule. For the foregoing reasons, we believe that special conditions 1 and 3, which abrogate rights expressly provided for in the Arizona Statutes and Constitution are invalid.

■ We do not, however, believe that there is any similar basis for invalidating special condition 2. This condition requires that a lessee who wishes to graze livestock on the land obtain a special land use permit. Havasu Heights contends that this condition is really a farce because, pursuant to A.C.R.R. (now called the Arizona Administrative Code, A.A.C.) R12–5–241, special use permits may only be issued for "purposes not otherwise provided for by law" and "grazing is a use otherwise provided for by law under A.R.S. §§ 37–101(9) and 37–281(A)." Havasu Heights misunderstands R12–5–241. The lands in question are currently classified as commercial lands. That classification recognizes use for both enumerated purposes and any other general purposes, *other than* grazing, agriculture, mining, ore, homesite or rights-of-way. A.R.S. § 37–101(6). In other words, if one of the latter activities is contemplated *on commercial lands,* a special land use permit is required. This is consistent with the statutory scheme, which provides that ordinarily, grazing is permitted only on lands for which no other "higher" purpose is available. *See* A.R.S. § 37–101(9). Because grazing on commercial lands is a deviation from the purposes contemplated by the statutes, we see nothing improper about requiring a special use

permit to be obtained. Accordingly, we uphold the validity of special condition 2.

## ARE THE TERMS AND PROCEDURES REGARDING HOLDING LEASES REQUIRED TO BE PROMULGATED AS RULES?

■ Havasu Heights next urges that the land department has, in essence, developed a "holding lease program," and that this program should have been promulgated under the rulemaking procedures of the Arizona Administrative Code, A.R.S. § 41–1001 *et seq.*

The Arizona Administrative Code defines "rule" as

a statement of general applicability that implements, interprets or prescribes law or policy, or describes the organization, procedure or practice requirements of any agency.

A.R.S. § 41–1001(7) (renumbered to § 41–1001(12) by Laws 1986, ch. 232, § 4, effective January 1, 1987). The definition specifically excludes statements concerning internal management or policy, not affecting the rights or procedures available to the public. *Id.* In order to be a "rule" under the Arizona scheme, a statement must be both of general applicability and have future effect. *See* "An Administrative Procedure Act for Arizona," 2 Ariz.L. Rev. 17, 23–24 (1960).

The department contends that the provision of the leases tendered to Havasu Heights which prohibits actual use or improvements to the land is not of general applicability because, although the same provision has been included in more than one lease, it is not routinely applied. It also contends that special conditions 1–3 are not of general applicability because they are not included in all holding leases, nor are they limited to only holding leases. We are not persuaded by this argument.

In his deposition testimony, Robert Lane, the State Land Commissioner referred to "the commercial leasing program." He also testified that the provision allowing no current commercial uses was generally applicable in commercial holding leases.

"General applicability" does not require uniform application. *See, e.g., Op.Atty. Gen. No. 77–166* (the policy of state land department of granting the holder of a certificate of purchase a time extension if the holder agrees to keep paying interest in the interim is sufficiently broad to require it be promulgated as a rule). It does require, however, applicability to more than one particular known circumstance. *See State Dept. of Commerce v. Matthews Corp.*, 358 So.2d 256, 258 (Fla.App.1978) (wage rates which only apply to construction of a particular public building or work specified therein are not "rules"). Stated another way, a "rule" is a policy which applies to a class, which is "open" in the sense that the class is described in general terms and new members which fit that description can be added. *Citizens for Sensible Zoning, Inc. v. Dept. of Natural Resources*, 90 Wis.2d 804, 280 N.W.2d 702, 707–08 (1979). *See also State Dept. of Commerce v. Matthews Corp.* at 258 (a rule looks to the future rather than past or present facts). We feel the "plan" instituted by the department for the potential development of rural urban lands meets these criteria. First, the promulgation of leases which prohibit all actual use of the property is not limited to the eight leases offered to Havasu Heights. Although the precise number and percentage of acres leased for holding purposes only is disputed, the department does not dispute that there are over 130 of these leases now in existence. The fact that not all of these leases have the same precise terms or special conditions as do Havasu Heights' leases does not change the fact that they are executed pursuant to an overall scheme or plan as contained in Policy Memo No. 4, from Joe T. Fallini, dated 10/1/79, outlining "Commercial Lands Policy." Additionally, the various policies and terms of holding leases are "regularly" or "routinely" applied to lands which fit within the description outlined in that memo. *Compare Rocky Mountain Oil and Gas Ass'n v. Watt*, 696 F.2d 734 (10th Cir.1982) (Bureau of Land Management's program which identified certain lands for wilderness protection, set up guidelines for the use and management of such lands, and specified allowable activities on those lands, was "rule"). Finally, although not all of the specific conditions in Havasu Heights' leases are included in all holding leases, the practice of issuing holding leases, and of requiring the lessee to agree to some or all of those "special conditions" is to be applied prospectively to as yet unknown lessees. *Cf. State Dept. of Commerce v. Matthews Corp.*

■ Finally, we address the contention by the department that requiring the department to promulgate rules governing holding leases would "tie its hands" and prevent it from treating each lease on an individual basis. Rule-making does not require that the department incorporate the same standard terms into every lease. Rather, rule-making requires the department to make public its policy regarding certain commercial lands, which should be identified to the best of the department's ability, including its intention to prohibit actual use and improvements. In addition, a rule would require the department to publicize the various standard provisions which may be included in such leases, with emphasis on what criteria will be utilized to determine when and where such provisions will be used. This would preserve the department's ability to treat each *parcel* individually, yet assure non-discriminatory treatment among competing lessees. Finally, the promulgation of such rules assures the opportunity for review by the attorney general. *See* A.R.S. § 41–1002.01 (attorney general reviews rules). In light of our previous discussion as to the invalidity of special conditions 1 and 3, such review might be beneficial.

## WAS CONSIDERATION FOR THE LEASES ILLUSORY?

■ Havasu Heights next argues that the leases which they purchased were illusory, because, although the lease carries a preferred right to renew the lease if the lands are ever reclassified for development pursuant to A.R.S. §§ 37–290 and –335, this preferred right is speculative, and entirely within the control of the promissor,

that is, the department. *See Restatement (Second) of Contracts* § 76(d).

Havasu Heights' argument misconstrues the rights it obtains under A.R.S. §§ 37–291, –293 and –335. These statutes grant preferred rights of renewal as between competing applicants. They do not give a preferred right as against the state. *See Cracchiolo v. State,* 146 Ariz. 452, 459, 706 P.2d 1219, 1226 (App.1985). That right as against other potential lessees has value. *Ehle v. Tenney Trading Co.,* 56 Ariz. 241, 246, 107 P.2d 210, 212 (1940). Therefore, it is not illusory and constitutes consideration for the lease.

## REMEDIES ON APPEAL

 Havasu Heights requests that this court order the commissioner to classify the lands involved as "grazing lands" and to reconsider its application for such grazing leases.

Under A.R.S. § 12–911, the trial court had authority only to "modify, affirm or reverse" the commissioner's August 23, 1983 decision. That decision held that the trust lands at issue were available for commercial leasing because Havasu Heights had rejected the commercial leases by counteroffer. There was no issue before the commissioner relative to tendering Havasu Heights different commercial leases nor were there issues about reclassifying the lands as "grazing lands." Thus, the superior court was without authority to direct the commissioner to tender leases with any particular provisions or to direct the commissioner to reclassify the land.

Further, the legislature has delegated its power and duty to classify state trust lands to the commissioner. A.R.S. §§ 37–132(A), –212(C) and –285(C). Neither the trial court nor this court may exercise its authority under A.R.S. § 12–911 to classify state trust lands. *See Arizona Corporation Comm'n v. Fred Harvey Transportation Co.,* 95 Ariz. 185, 190, 388 P.2d 236, 239 (1964) (superior court may not exercise or supersede an essential function of another public body). The court's function is solely to review the commissioner's orders, not to substitute its order for that of the commissioner.

Because we have determined that two of the terms of the leases offered by the department are invalid, and that the department must promulgate rules to institute its holding lease program, we conclude that the department has not yet tendered legal leases to Havasu Heights. Because Havasu Heights holds a preferred right to renewal, we conclude that the commissioner erred in finding that the land is properly available for commercial leasing by parties other than Havasu Heights. Aside from this determination, we have only the authority to remand this matter to the trial court with directions to remand the issue of holding leases to the commissioner for further proceedings as are consistent with this decision. *See Civil Service Comm'n v. Mills,* 23 Ariz.App. 499, 503, 534 P.2d 430, 434 (1975).

CONTRERAS, P.J., and EUBANK, J., concur.