212 P.3d 62

**Max KOEPNICK, an individual, Plaintiff/Appellant,**

v.

**ARIZONA STATE LAND DEPARTMENT, an agency of the State of Arizona; Mark Winkleman, Arizona State Land Commissioner; Arizona Land Board of Appeals, Defendants/Appellees.**

**No. 1 CA–CV 07–0271.**

Court of Appeals of Arizona, Division 1, Department E.

Feb. 26, 2009.

Bryan Cave, LLP By Steven A. Hirsch, and Stanley B. Lutz, Phoenix, Attorneys for Plaintiff/Appellant.

Terry Goddard, Arizona Attorney General By Donald J. Baier, Assistant Attorney General, and Theresa M. Craig, Assistant Attorney General, Phoenix, Attorneys for Defendants/Appellees.

Moyes Sellers & Sims Ltd. By Steven L. Wene, Phoenix, Attorneys for Amicus Curiae Arizona Cattle Growers' Association, Arizona Cotton Growers Association, and Arizona Farm Bureau.

Ridenour, Hienton, Kelhoffer & Lewis PLLC By Jeffrey A. Bernick, Phoenix, Attorneys for Amicus Curiae Farm Credit Services Southwest.

## OPINION

NORRIS, Judge.

¶ 1 This appeal arises out of an order entered by the Arizona Land Board of Appeals affirming a decision by the Commissioner of the Arizona State Land Department reclassifying state trust land leased by appellant Max Koepnick from agricultural to commercial. The superior court affirmed on review of the Board's decision. On appeal, Koepnick argues the reclassification was improper as a matter of law and made by the Commissioner in violation of his constitutional, statutory and contractual duties. As we explain below, we disagree and affirm the superior court's decision.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 In 1910, Congress passed the Arizona–New Mexico Enabling Act. Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 stat. 557 ("Enabling Act"). The Enabling Act authorized "the people of the territories of Arizona and New Mexico to form state governments." *Kadish v. Ariz. State Land Dep't*, 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987). The Enabling Act granted almost ten million acres of land to the state of Arizona ("state

trust land") to be held in trust (the "trust") for the support of public schools. Enabling Act §§ 24, 28; *Mayer Unified Sch. Dist. v. Winkleman*, 219 Ariz. 562, 564, ¶ 2, 201 P.3d 523, 525 (2009); *Forest Guardians v. Wells*, 201 Ariz. 255, 257, ¶ 2, 34 P.3d 364, 366 (2001). The Arizona State Land Department, under the supervision of the Commissioner (unless otherwise specified, collectively "Department"), administers state trust land, which includes leasing the land for agricultural or other purposes.[1]

¶ 3 In February 1997 and February 2003, Koepnick renewed two agricultural leases which together comprised 900 acres of contiguous state trust land in Pinal County ("subject parcel"). Koepnick and his predecessors had continuously leased the subject parcel, part of a larger farming operation, for over 50 years and had spent considerable money to make improvements to it ("existing improvements").

¶ 4 On February 16, 2006, the Commissioner, on his own initiative, reclassified the subject parcel from agricultural to commercial because it was "located in an area experiencing significant residential and commercial development" and reclassification would best serve the interests of the trust ("reclassification order"). *See* Ariz.Rev.Stat. ("A.R.S.") § 37–212(C) (2003). By operation of law, the reclassification cancelled Koepnick's agricultural leases. A.R.S. § 37–290(A) (2003).

¶ 5 Koepnick appealed the reclassification order to the Arizona Land Board of Appeals ("Board"). *See* A.R.S. § 37–215 (2003). As discussed below, Koepnick argued the reclassification was improper as a matter of law; was implemented to protect Pinal County from having to compensate him for damages to his existing improvements caused by a right-of-way; was not in the best interests of the trust; and violated his rights as a lessee. After holding an evidentiary hearing ("hearing"), the Board affirmed the Commissioner's reclassification order.

¶ 6 Koepnick sought judicial review of the Board's decision from the superior court.

---

1. *See infra* ¶¶ 18–22 for further discussion of the Department's duties in administering state trust land.

After briefing and argument, the superior court affirmed the Board's decision. Koepnick timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and A.R.S. § 12–913 (2003).

## DISCUSSION

### I. Standard of Review

¶ 7 The superior court reviews an administrative decision by a board to determine whether it was illegal, arbitrary, capricious, or involved an abuse of discretion. A.R.S. § 12–910(E) (2003). "This court reviews the superior court's judgment to determine whether the record contains evidence to support the judgment and, in doing so, we reach the underlying issue of whether the administrative action was illegal, arbitrary, capricious or involved an abuse of discretion." *Havasu Heights Ranch and Dev. Corp. v. Desert Valley Wood Products, Inc.*, 167 Ariz. 383, 386, 807 P.2d 1119, 1122 (App. 1990) ("*Havasu Heights II*"). "[I]f the administrative decision was based on an interpretation of law, it is reviewed *de novo.*" *Forest Guardians*, 201 Ariz. at 259, ¶ 9, 34 P.3d at 368. "As to questions of fact, this court does not substitute its conclusion for that of the [agency], but reviews the record only to determine whether substantial evidence supports the agency's decision and whether the [agency] exercised its discretion reasonably and with 'due consideration.'" *Siegel v. Ariz. State Liquor Bd.*, 167 Ariz. 400, 401, 807 P.2d 1136, 1137 (App.1991) (quoting *Petras v. Ariz. State Liquor Bd.*, 129 Ariz. 449, 452, 631 P.2d 1107, 1110 (App. 1981)).

### II. Classification and Reclassification of Commercial and Homesite Lands

¶ 8 The statutes governing administration of the trust require the Commissioner to classify and appraise state trust land for the purpose of sale, lease or grant of rights-of-way. A.R.S. § 37–132(A)(5) (Supp.2008). State trust lands are appraised according to their classification, which is determined by considering their highest and best use. *Forest Guardians*, 201 Ariz. at 260, ¶ 15, 34 P.3d at 369. The Legislature has established various classifications for state trust land including agricultural, commercial, and homesite. A.R.S. § 37–212(B). "'Commercial lands' means lands which can be used principally for business, institutional, religious, charitable, governmental or recreational purposes, or any general purpose other than agricultural, grazing, mining, oil, homesite or rights-of-way." A.R.S. § 37–101(3) (2003). "'Homesite lands' means lands which are suitable for residential purposes." A.R.S. § 37–101(9). The Commissioner may also reclassify state trust land—thereby cancelling any existing lease on that land—after "determin[ing] that reclassification is in the best interest of the trust and of the state." A.R.S. §§ 37–212(C) and –290(A).

¶ 9 At the hearing the Department presented evidence the subject parcel was surrounded by residential subdivisions and supporting commercial and educational facilities. It also presented evidence the highest and best use of the subject parcel was no longer for agricultural purposes, but for development. Indeed, the Department stipulated that a significant portion of the subject parcel would be developed for residential purposes with the remainder for commercial use.

¶ 10 Relying on this evidence that, as Koepnick correctly notes, was undisputed, Koepnick construes the commercial and homesite classifications by focusing on the ultimate end use of the subject parcel following development. Because the commercial classification means "lands which can be used principally for business ... or any general purpose other than ... homesite" and the homesite classification means "lands which are suitable for residential purposes," Koepnick argues the Commissioner was prohibited from reclassifying the subject parcel from agricultural to commercial as it was undisputed that a significant portion of the subject parcel would be developed for residential purposes. Accordingly, Koepnick contends the Commissioner's reclassification was improper as a matter of law. Koepnick's argument presents a question of law; thus, our review is de novo.

¶ 11 We are unpersuaded by Koepnick's construction of the commercial classification. By focusing solely on the eventual post-development end uses of the subject parcel, Koepnick ignores that the property will first need to be developed for these end uses.[2] Although the legislature has not defined "business," the ordinary definition of business, as applicable in this context, is commonly understood to mean a commercial transaction, enterprise or endeavor. 2 Oxford English Dictionary 696 (2d ed.2000); *see also* Webster's New College Dictionary 149 (1995).[3] The development of land for subsequent residential and commercial use constitutes a commercial enterprise or endeavor and thus, a business use. Therefore, land used for development falls squarely within the commercial classification.

¶ 12 Further, although a significant portion of the subject parcel will become suitable for residential use through the development process, this end use does not trigger the homesite classification. In ordinary usage, a homesite is a house lot or a location suitable for a home. 7 Oxford English Dictionary 330 (2d ed.2000); *see also* The New Oxford American Dictionary 809 (2d ed.2005) (defining "homesite" as "a building plot for a house"). Homesite land—land that the legislature has said is "suitable for residential purposes"—thus means land suitable for a home. Land suitable for a home is not the same as land that, after development, will eventually be used for residential purposes.

¶ 13 The Department has applied the commercial and homesite classifications in accordance with this distinction. Linda Beals, the Department's Right–of–Way Section Manager, testified the Department has applied the commercial classification to large residential development projects. Cynthia Stefanovic, the Department's Water Rights and Agricultural Manager, also testified the Department had not used the homesite classification for "massive multi-family" land uses. Instead, the homesite classification has been interpreted by the Department to mean "just one specific homesite to be utilized in conjunction with the grazing or agricultural lease. It is not residential as in massive multi-family." Stefanovic also explained the homesite classification was "typically" for "a single site to an occupant." Consistent with this testimony, the Board "conclude[d] that the subject land would not fit into any other category but commercial at this time and that this classification is supported by industry practices and is appropriate." [4]

¶ 14 The Department's construction of the commercial and homesite classifications is reasonable and consistent with the statutory language. Therefore, we adopt it. *Cf. Ariz. Water Co. v. Ariz. Dep't of Water Res.,* 208 Ariz. 147, 154, ¶ 30, 91 P.3d 990, 997 (2004) (when legislature has not spoken definitively to issue at hand, considerable weight should be afforded to agency's construction of statutory scheme it administers).

---

2. At the hearing, Department employees acknowledged the Department planned to grant Pinal County a right-of-way over a 25–acre portion of the 900–acre subject parcel, but had no successor immediately ready to otherwise develop it. Based on this, Koepnick argues the reclassification order was improper because commercial lands cannot be used for rights-of-way under A.R.S. § 37–101(3). The right-of-way exclusion in § 37–101(3) is not as broad as Koepnick believes. Under § 37–101(3), commercial lands are "lands which can be used principally for" certain designated purposes, but cannot be used for the "general purpose" of a right-of-way. Therefore, the commercial lands classification may apply to state trust land containing a right-of-way so long as the right-of-way is not the land's "general purpose" and the land is used "principally" for one of the designated purposes in § 37–101(3). "Principal" means "chief; primary; most important." Black's Law Dictionary 1213 (8th ed.1999); *see also* Webster's New College Dictionary 879 (1995). As we explain, the Department did not reclassify the subject parcel for the "general purpose" of a 25–acre right-of-way; rather, it reclassified the subject parcel so it could be used principally, that is, primarily, for one of the designated purposes under § 37–101(3).

3. When, as here, the legislature has "not defined a word or phrase in a statute, we will consider respected dictionary definitions." *Urias v. PCS Health Sys., Inc.,* 211 Ariz. 81, 85, ¶ 22, 118 P.3d 29, 33 (App.2005).

4. One Board member noted "reclassification to commercial is absolutely in concert with what we have done in the past with other agricultural parcels.... I mean, when you don't want it to be agricultural and you want to be able to use it for either commercial leases or residential sales, that's typically the catch all."

Accordingly, state trust land that can be used for development is land "which can be used principally for business." That the end product of this developmental activity will support mostly residential use, as the record reflects here, does not make that activity any less of a business.

¶ 15 Finally, the Department's construction of the commercial classification is supported by our decision in *Havasu Heights Ranch and Development Corp. v. State Land Department*, 158 Ariz. 552, 764 P.2d 37 (App. 1988) ("*Havasu Heights I* "). In *Havasu Heights I*, we held the Department was authorized to enter into "commercial holding leases." 158 Ariz. at 557, 764 P.2d at 42. Such leases prohibit any actual use of the property, thus leaving the property available for future speculative investment purposes. Whether the Department had such authority turned on whether state trust land held for investment purposes without making any actual use of the property constituted a valid commercial use within the meaning of the statutory predecessor to A.R.S. § 37–101(3). We explained the word "use" in what was then A.R.S. § 37–101(6)[5] could mean either actual use or "the ability or power to use something." *Havasu Heights I*, 158 Ariz. at 557, 764 P.2d at 42. As used in context, we held the word use means purpose, "an end, objective, plan or project," and did not require actual use. *Id.* Based on that construction, we stated that "[h]olding for potential future profit can be reasonably construed as either a 'business purpose' or 'any general purpose other than agricultural, grazing, mining, oil, homesite, or rights-of-way.' " *Id.*

¶ 16 Just as holding property for potential future profit is a business, so too is holding and using property for development. Each constitutes a business and, as such, falls within the commercial lands classification. We therefore reject Koepnick's argument the

Commissioner's reclassification of the subject parcel was improper as a matter of law.[6]

## III. Reclassification and the Commissioner's Duties to the Trust and to Koepnick

¶ 17 Next, Koepnick argues the Board should not have affirmed the reclassification order because the Commissioner "abused his reclassification authority" by breaching the fiduciary duties he owed to the trust and the constitutional, statutory, and contractual duties he owed to Koepnick as a lessee of state trust land. In support of these arguments, Koepnick asserts the evidence at the hearing demonstrated the Commissioner reclassified the subject parcel as part of a multifaceted "deal" with Pinal County: the Department agreed to reclassify the subject parcel, thus terminating Koepnick's leases, so Pinal County could obtain a right-of-way over a portion of the subject parcel without having to pay Koepnick for damages to the existing improvements caused by the right-of-way; and in exchange for the reclassification and resulting lease terminations, Pinal County agreed to re-zone the subject property. Koepnick further asserts the evidence at the hearing demonstrated that at the time the Department reclassified the subject parcel, it had no immediate plans to sell or lease the subject parcel and thus there was no reasonable likelihood that Koepnick would be reimbursed for his existing improvements by any succeeding lessee or purchaser. To analyze Koepnick's arguments, we first summarize the regulatory framework regarding state trust lands and the duties imposed on the Department concerning its management. We then address the evidence presented to the Board at the hearing to determine whether, as Koepnick contends, the Commissioner abused his reclassification and thus his managerial authority.

---

5. · Section 37–101(6) was renumbered as § 37–101(3) in 1994. *See* 1994 Ariz. Sess. Laws ch. 171, § 1 (2d Reg.Sess.).

6. The superior court found the homesite classification would have been "appropriate." Nevertheless, it affirmed the Board's decision because even if the Commissioner had reclassified the

subject parcel to homesite, the reclassification would still have terminated Koepnick's leases. Because we have determined the Commissioner properly applied the commercial classification to the subject parcel, we need not address Koepnick's arguments regarding the superior court's application of the applicable statutes.

### A. The Department's Duties to the Trust and to its Lessees

¶ 18 Pursuant to statutory authorization, the Department is responsible for managing state trust land. *See* A.R.S. § 37–102 (2003). The Department, through the Commissioner, has the same fiduciary obligations as does any private trustee: it must manage state trust lands for the benefit of the trust and its beneficiaries. *Kadish,* 155 Ariz. at 487, 747 P.2d at 1186; *Berry v. Ariz. State Land Dep't,* 133 Ariz. 325, 327, 651 P.2d 853, 855 (1982); *Jeffries v. Hassell,* 197 Ariz. 151, 154, ¶ 10, 3 P.3d 1071, 1074 (App. 1999). Under the Enabling Act, state trust land must be appraised at its true value and cannot be sold for less than the appraised amount. *Mayer Unified Sch. Dist.,* 219 Ariz. at 565, ¶ 8, 201 P.3d at 526, 2009 WL 348353, at *2 (citing Enabling Act § 28). Furthermore, state trust land must be leased or sold to the "highest and best bidder at a public auction." Enabling Act § 28. "Disposal of any trust land in a manner not substantially conforming to the provisions of the Enabling Act constitutes 'a breach of trust' that renders the disposition of trust land 'null and void.'" *Mayer Unified Sch. Dist.,* 219 Ariz. at 565, ¶ 8, 201 P.3d at 526, 2009 WL 348353, at *2 (quoting Enabling Act § 28).

¶ 19 The Department is thus obligated to maximize trust revenue. *Gladden Farms, Inc. v. State,* 129 Ariz. 516, 520, 633 P.2d 325, 329 (1981). Immediate revenue, however, is not the sole consideration in determining the best interest of the trust. *See Havasu Heights II,* 167 Ariz. at 392, 807 P.2d at 1128 ("[t]he best interest standard does not require blind adherence to the goal of maximizing revenue") (internal quotations omitted). As we have explained, the "Commissioner has great discretion concerning the disposition of trust lands and has authority to devise detailed plans for the sale, lease and use of state land." *Campana v. Ariz. State Land Dep't,* 176 Ariz. 288, 291, 860 P.2d 1341, 1344 (1993). And, as we have also recognized, the Commissioner may "legitimately consider alternate future uses of state land." *Havasu Heights II,* 167 Ariz. at 391, 807 P.2d at 1127. Thus, the Commissioner will not abuse his or her discretion if he or she decides to forego immediate revenue to obtain "public benefits flowing from employing state land in uses of higher value." *Id.* at 392, 807 P.2d at 1128.

¶ 20 In addition to his or her duties to the trust, the Commissioner also owes duties to state trust land lessees. The Commissioner must ensure that a prior lessee is reimbursed by a successor purchaser or lessee (collectively, "successor") for the value of approved improvements placed on state trust land by the prior lessee. *See* Enabling Act § 28; Ariz. Const. art. X, § 10; A.R.S. §§ 37–322.01 and –322.02 (2003). And, even when the Department reclassifies state trust land, the prior lessee is entitled to reimbursement for those improvements by a successor lessee. A.R.S. § 37–290(C).

¶ 21 Our supreme court has further recognized that reimbursement not only protects the lessee but also benefits the trust:

> The protection of the rights of a lessee for improvements placed upon premises is to the best interests of the state as trustee, for the reason that otherwise the state would not be able to lease such property to advantage. Unless a lessee was so protected, he would not be willing to place valuable improvements on the property, and it would be difficult to lease it in some instances—particularly for commercial purposes.

*State Land Dep't v. Painted Desert Park, Inc.,* 102 Ariz. 272, 279, 428 P.2d 424, 431 (1967).

¶ 22 Finally, the duties and obligations owed by the Commissioner to state trust land lessees under our constitution and statutes are augmented by the duty of good faith and fair dealing contractual parties owe each other under Arizona law. *Cf. Arizona's Towing Professionals, Inc. v. State,* 196 Ariz. 73, 77, ¶ 23, 993 P.2d 1037, 1041 (App.1999) (contract between state agency and private company); *Havasu Heights II,* 167 Ariz. at 389, 807 P.2d at 1125 (laws of the state are a part of every contract).

*B. Improvements*

■ ¶ 23 As part of its managerial responsibilities, the Department oversees alterations to state trust land. Before a lessee can "construct or make improvements" on state trust land, the lessee must first request permission from the Department. A.R.S. § 37–321(A) (2003).[7] The lessee's request "shall be allowed or rejected as the best interest of the state requires as determined by the [State Land] department." *Id.* And, as described above, the Department must ensure a lessee is reimbursed for these approved improvements by a succeeding lessee or purchaser. *See* Enabling Act § 28; Ariz. Const. art. X, § 10; A.R.S. §§ 37–322.01, –322.02; *Painted Desert Park*, 102 Ariz. at 279, 428 P.2d at 431.

■ ¶ 24 The Department's management responsibilities also include granting rights-of-way over state trust land. *See* A.R.S §§ 37–132(A)(5) and –461 (2003). "The Commissioner has the right to grant rights-of-way without the consent of [a lessee]." Ariz. Admin. Code ("A.A.C.") R12–5–801(C)(4)(a). Accordingly, the Department "reserve[d] the right to grant rights of way … for public highways" in Koepnick's leases for the subject parcel. If the Department granted a right of way over the subject parcel, Koepnick agreed in his leases to waive "all right to any compensation whatsoever" from the Department. Under the Department's regulations, however, the grantee of a right-of-way "shall restore the surface of the land within the right-of-way to a reasonable condition as required by the Commissioner." A.A.C.R12–5–801(D)(4)(a)(iv).

*C. The Department's Five–Year State Trust Land Disposition Plan and Growth in Pinal County*

¶ 25 In keeping with its managerial responsibilities over state trust land, in 2004, the Department issued its Five–Year Estate Trust Land Disposition Plan ("Plan"). Although the Plan disclaimed finality and was advisory regarding disposition of state trust land, a departmental witness testified at the hearing that the Plan called for the disposition of the subject parcel, beginning with a portion of the property in 2008. The Plan noted Pinal County had experienced the greatest growth rate of any Arizona county between 2000 and 2003 and one Pinal County municipality, Florence, had more than doubled its residents between 1990 and 2000.

¶ 26 The Plan also reported "[t]here is also emerging interest in the Apache Junction area in part due to the fact that the Trust lands are positioned to capture the next wave of development" as Phoenix expands eastward. As a result, the Plan suggested the Department would begin to focus its projects and sales on Apache Junction by 2008. The Plan concluded by noting:

> [i]n order to enhance the value of the Trust asset, the Department needs to be abreast of market changes and position itself to capture timely opportunities as they arise. Planning and entitlement work in advance of a disposition locks in the certainty of the highest and best use of the Trust land. Entitlements should be secured, at a minimum, six months to a year before a disposition occurs. Another vital ingredient to enhance value is proximity to developed infrastructure. Land should be released in an orderly manner optimizing infrastructure cost and financing.

> . . . .

> Historically, Department planning and engineering have been reactive and application driven, with responses being made from a static position. In order to effectively plan and engineer land in advance of a market, the Department has to adopt a dynamic model for making decisions. It is critical to identify market demand and sup-

---

7. "It was undoubtedly the intention of the legislature in enacting A.R.S. § 37–321 to restrict and prevent a lessee from putting expensive improvements on the leased premises for which he must be reimbursed by a subsequent purchaser or lessee, but which would be of little use for the purposes for which the land would normally be leased. In like manner, the state is not obligated to pay for expensive and unanticipated improvements when the land is taken over for its use. This is limited, however, in that it does not apply in cases where the improvements are reasonably necessary for the purposes provided for in the lease." *Painted Desert Park*, 102 Ariz. at 281, 428 P.2d at 433.

ply components to effectively evaluate a disposition.

¶ 27 In 2004, separate from the Department's evaluation of the disposition of state trust land as reflected in the Plan, Pinal County evaluated growth between Apache Junction and Florence. To meet current traffic demands and accommodate future development, Pinal County determined it needed to expand a road transecting the subject parcel that served as one of the primary arterials in and out of this particular segment of Pinal County. Accordingly, it proposed constructing a major intersection on the subject parcel and applied to the Department for a right-of-entry and a right-of-way for this construction.[8]

### D. The Subject Parcel, Its Reclassification, Koepnick's Allegations, and the Evidence Presented at the Hearing

¶ 28 The proposed right-of-way presented a significant disruption to Koepnick's irrigation system because it would bisect his farming operation. Koepnick obtained an estimate showing that it would cost approximately $772,299.20 to restore ("restoration improvements") the existing improvements so he could continue farming the subject parcel after construction of the right-of-way.

¶ 29 Instead of approving the restoration improvements and requiring Pinal County to pay Koepnick for those improvements, the Commissioner decided to reclassify the subject parcel. As we have discussed, Koepnick alleges the Commissioner did not reclassify the subject parcel according to its highest and best use, but to implement the alleged "deal" with Pinal County.

¶ 30 In support of this argument, Koepnick relied on handwritten notes by Gloria Nichols, an administrator for the Department's right-of-way section, that made cryptic comments, such as "ag lease will terminate w/reclass," "money issue w/ county" and "Patty/Linda, re-class letter agree with Pinal County less payment to Max." Koepnick also

relied on a memorandum written by David Kuhl, the Pinal County planning director. The memorandum stated in relevant part:

We would gain 3/4 million dollars in not having to compensate Koepnick for his irrigation improvements if the State cancels his farm lease. State would benefit by having their property rezoned, thus worth more money than what would be generated by the current farm lease. The farmer could continue with his farming and lease, but would not be compensated for his irrigation improvements. This arrangement would benefit the Trust, so State Land supports it.

¶ 31 As further support for his position, Koepnick asserted the reclassification was premature and unnecessary because, as the Department conceded, it did not have a successor for the subject parcel and Koepnick could have continued farming while the Department granted the right-of-way and prepared the subject parcel for disposition. Koepnick also argued the reclassification amounted to bad policy because it would inhibit the Department's ability to lease land in the future: other lessees would be less likely to make improvements to state trust land because "their leases may be cancelled at any time, and without proper compensation."

¶ 32 Whether the Department reclassified the subject parcel to reflect its highest and best use, or, as Koepnick argues, to facilitate an alleged deal with Pinal County, is an issue that required factual determinations. Given this, we cannot substitute our conclusions on issues of fact for those reached by the Board. *See Siegel*, 167 Ariz. at 401, 807 P.2d at 1137. Instead, our role is to review the Board's decision affirming the reclassification order for an abuse of discretion, that is, to see if it was supported by substantial evidence and if the Board's discretion was exercised reasonably and with due consideration. *Id.* The Board concluded the subject parcel was "gravitating to its highest and best use, and that

---

8. At the hearing, various witnesses testified the roads in the subject parcel were older and in poor condition and there was considerable traffic congestion in the area. The witnesses also testified that construction of the right-of-way would benefit existing traffic and was key to developing the subject parcel and realizing its highest and best use. Koepnick, through counsel, also acknowledged the "road's important."

such use will not be agriculture in the near future based on the path of development in the area." The Board also concluded the "best interests of the Trust would be served by the reclassification to commercial." Based on the evidence presented at the hearing, we cannot say the Board abused its discretion in making these determinations.

¶ 33 According to testimony at the hearing by Linda Beals, the Department was dealing with other, unrelated issues concerning a different section of the right-of-way when it learned of Koepnick's $772,299.20 estimate for the restoration improvements. Because of the estimated cost of the restoration improvements, the Department decided to evaluate whether the subject parcel's highest and best use was still agricultural. After reviewing the development surrounding the subject parcel, the Department determined the subject parcel would soon be developed and, therefore, agriculture was no longer the highest and best use for the land. Thus, the Department decided it would not approve the proposed restoration improvements because it would have to deduct their cost from the amount paid by a successor, thereby reducing the amount the trust could earn when it disposed of the subject parcel. *See supra* ¶ 20. The Department concluded it would be in the trust's best interest to reclassify the subject parcel and also realized that, if the subject parcel was re-zoned, as Pinal County was contemplating, the marketability of the subject parcel would be significantly enhanced. As explained by Beals, "the [D]e-

partment's intention with this property [wa]s to get it ready for disposition. And part of that process is to get it zoned, to get it, essentially, unencumbered, certainly not to add any additional encumbrances to it."

¶ 34 In addition to Beal's testimony, the Department presented evidence the subject parcel was surrounded by residential and commercial development with more development expected. The Department also explained that reclassification to commercial would give it additional flexibility in disposing of the subject parcel because it would be able to sell more than 160 acres to a potential buyer. *See* Ariz. Const. art. X, § 11; A.R.S. § 37–240(A) (2003) (limiting sale of agricultural land to 160 acres).

¶ 35 The Board was presented with substantial evidence supporting the Department's determination that the subject parcel's highest and best use was commercial and not agricultural and, as a result, it would not be in the best interests of the trust to approve the restoration improvements.[9] *See Havasu Heights II,* 167 Ariz. at 391, 807 P.2d at 1127 ("The commissioner may legitimately consider alternate future uses of state land. A higher future use would fall within the 'best interest' standard established by the statute."); *Havasu Heights I,* 158 Ariz. at 557, 764 P.2d at 42 ("Keeping its options open may, under certain circumstances be the 'best use' of the land. The commission-

9. In its Findings of Fact, the Board stated:

The State Land Department reclassified the subject land to commercial because they contend that the highest and best use of the land is no longer agriculture. The Department asserts that the subject property is completely surrounded by residential and commercial development and that more extensive development is imminent. According to the Pinal County General Plan, development of the subject area is planned for 2008. The Department further contends that the reclassification to commercial is appropriate for lands that are not specifically planned because this is a "catch-all" category that the Land Department properly uses to hold land for any possible future development uses. Moreover, since this property is in the path of development, agricultural use will not be its highest and best use.

[Koepnick] called several witnesses from the Land Department. Land Department staff

confirmed that it is not necessary to reclassify the property in order to grant the pending Right of Way application with Pinal County for the [proposed road extension].... The Department acknowledged that [it was] concerned with proceeding with the Right of Way knowing that all these improvements were on the property that would most likely not be allowed to be replaced since the highest and best use of the land was no longer agricultural use. The Land Department determined that allowing the farm to resume operation and further encumber the land with the high cost of the projected retrofit improvements would not be in the best interest of the Trust. Moreover, even if [Koepnick's] current leases were allowed to naturally expire, the Department would not renew them because of the path of development in the area and the fact that agriculture is not the land's highest and best use.

er's discretion in this regard will not be disturbed absent an abuse of discretion.").

¶ 36 Although reclassification meant the subject parcel was not generating revenue for the trust in the short term, "[w]e cannot say that the failure to generate immediate income by declining to renew the lease was an abuse of discretion under all of the circumstances. This is precisely the type of decision which is best left to the expertise and discretion of the commissioner." *Havasu Heights II,* 167 Ariz. at 392, 807 P.2d at 1128.

¶ 37 Kuhl's memorandum, standing alone, may have rightfully aroused Koepnick's suspicions. When Kuhl testified at the hearing, the Board's Chairperson observed the memorandum could give the impression of a "quid pro quo" between the County and the Department. Kuhl testified, however, that the memorandum was based on his own "incorrect" understanding "of what it could be." He also denied that Pinal County and the Department had agreed to help each other out. Another witness testified the statements made by Kuhl in his memorandum were outside his area of expertise and based on incorrect information. Other Department witnesses also denied the Department had reclassified the subject parcel so Pinal County would not have to pay for the restoration improvements. The Board heard these witnesses and determined this testimony to be credible. We are not in a position to disturb that conclusion. *See Nutek Info. Sys., Inc. v. Ariz. Corp. Comm'n,* 194 Ariz. 104, 111 n. 8, ¶ 29, 977 P.2d 826, 833 n. 8 (App.1998) ("In administrative appeals, the fact finder determines the credibility of witnesses, and we do not look over his shoulder.").

¶ 38 Moreover, Nichols testified about her handwritten meeting notes and stated she did not remember who was present at the meetings, or when the meetings occurred. Nor could she recall the context of her notes or any details from the relevant meetings. These notes do not clearly refer to any statement by any employee of Pinal County or the Department and do not necessarily support Koepnick's theory of an alleged improper relationship between Pinal County and the Department.

¶ 39 Although the Department could have chosen another course of action, its statutory obligation to ensure Koepnick's reimbursement by a successor [10] along with its right-of-way regulations did not require the Department to maintain Koepnick's agricultural leases and approve the restoration improvements. Indeed, by reclassifying the subject parcel, the Department was taking steps consistent with recommendations made in its Plan: to identify land ready for development and proactively prepare that land for disposition. Moreover, the Department believed that if Pinal County rezoned the subject parcel, it would then be in position to dispose of the property more quickly, thus accelerating when Koepnick would be reimbursed for the existing improvements. As the Department's Linda Beals explained:

> The county ... said we will ... look at rezoning ... and we'll look to moving this forward with disposition. The more we looked at it, the more it made sense, because if we could get this thing zoned, if we can get the improvement issues resolved, if we can get the lease issues re-

---

**10.** The Board's Decision and Order addressed Koepnick's right to reimbursement for improvements:

> [Koepnick's] current leases expire in February 2007 and February 2013. The terms of [Koepnick's] lease include the provision that the Lessor (the Department) may grant rights of way and that [Koepnick] waives all right to any compensation whatsoever from the Lessor should this right be exercised. Therefore, the Department would not reimburse [Koepnick] just as they do not reimburse any lessees of state land under these circumstances. The Department notes that [Koepnick] will be reimbursed at some point in the future for any

reimbursable improvements under statute by a new lessee or owner of the subject property.
> Present and former employees of Pinal County were also called by [Koepnick]. The witnesses provided various accounts of how they thought the Right of Way project was going to work and whether or not [Koepnick] was going to be reimbursed for his [existing] improvements to the land. None of the witnesses provided any definitive answers to these questions. However, it is determined that the Department could have required the County to pay restoration costs to [Koepnick] if the[] highest and best use of the property would still be agriculture.

solved, then we're in a position to move this property forward quickly.

¶ 40 Finally, Koepnick, joined by Amici,[11] assert that in reclassifying the subject parcel, the Commissioner breached the constitutional, statutory and contractual obligations he owed to Koepnick as a lessee of state trust land because there was no immediate successor for the subject parcel and thus little likelihood Koepnick would be reimbursed for his existing improvements in the immediate future, thereby rendering his right to reimbursement illusory.[12] As Amici view the situation, the Department is

> seeking to establish it has the power to terminate any trust land lease, anywhere, at any time.... [T]he Commissioner would have the ability to terminate any lease by predicting that anytime in the future, the land could be used for some "higher" purpose that could benefit the trust more than the existing lease. The Commissioner's only "constraint" in reclassifying trust land, and canceling a lease, is his own discretion and imagination concerning what *may* occur in the future.

¶ 41 The scenario described by Koepnick and Amici is not, however, presented here. Not only was the reclassification within the Commissioner's statutory authority, but the evidence amply supported the Board's conclusion that the Commissioner's decision to reclassify was supported by substantial evidence—"the land [was] gravitating to its highest and best use and ... such use will not be agricultural in the near future based on the path of development in the area," and "the best interests of the Trust would be served by the reclassification to commercial." The reclassification in this case was not arbitrary, capricious or an abuse of discretion.[13]

 ¶ 42 Koepnick's and Amici's argument that reclassification in the absence of

an immediate successor renders the right to reimbursement illusory presupposes the Commissioner can only reclassify state trust land when there is a successor in the wings or when the lessee will obtain immediate reimbursement. The regulatory framework, however, is to the contrary. The plain language of A.R.S. § 37–212(C) requires the Commissioner to consider the best interest of the trust when reclassifying state trust land and does not limit reclassification to situations in which the Department has a successor at hand. Although protecting the reimbursement rights of a lessee is in the best interest of the trust, protecting those rights does not mean the Commissioner cannot take into account the present, potential and probable use of state trust land. Indeed, the Commissioner's determination of the trust's "best interest" is made in light of "all of the circumstances." *Havasu Heights II*, 167 Ariz. at 392, 807 P.2d at 1128. This case demonstrates that the duties and obligations the Commissioner owes to the trust and state trust land lessees may conflict. But, on the facts presented here, we discern no abuse of discretion in how the Commissioner resolved this conflict and performed those duties and obligations.

## CONCLUSION

¶ 43 For the foregoing reasons, we affirm the superior court's judgment affirming the Board's decision to approve the reclassification of the subject parcel to commercial.

CONCURRING: DONN KESSLER, Judge and JOHN C. GEMMILL, Judge.

---

11. Amici in this case are the Arizona Cattle Growers' Association, Arizona Cotton Growers Association, Arizona Farm Bureau, and Farm Credit Services Southwest.

12. We note that here, as in *Havasu Heights II*, the on-going litigation has prevented the Department from taking "any action during this appeal that would trigger reimbursement." 167 Ariz. at 394, 807 P.2d at 1130.

13. Although, as Koepnick's counsel suggested during oral argument, the market conditions relating to the development of the subject parcel have changed since the 2006 reclassification order, any such change in circumstances caused by the passage of time does not mean the reclassification order was improper when it was made.